**VICTORIAS MILLING CO., Inc., as owners of THE M/V NONSUCO,**
Libelant,

v.

**PANAMA CANAL COMPANY,**
Respondent.

No. 4129.

District Court, Canal Zone,
Division Balboa.

April 22, 1955.

Woodrow de Castro, Balboa, C. Z., and Michael E. Hanrahan, New York City, for libelant.

David J. Markun and Theodore P. Daly, of the General Counsel's Office, Panama Canal Co., Balboa Heights, C. Z., for respondent.

CROWE, District Judge.

1. The M/V Nonsuco is a twin-screw motor cargo vessel of Philippine registry. It has a gross tonnage of 5212, a net tonnage of 3084, an overall length of 439′, and a beam of 56.1′. The authorized maximum mean draft of the Nonsuco in tropical fresh-water is 26′ 7¼″. The vessel's draft on August 15, 1954 in the fresh water of the Panama Canal was 24′ 1″ forward and 27′ 9″ aft. The vessel was built in 1938 by William Doxford and Sons, Ltd., Sunderland.

2. The parties prior to trial stipulated as to the admissibility of the transcript of the testimony taken before the Board of Local Inspectors of the Canal Zone Government on August 17, 1954. The Board of Local Inspectors is charged by law with the investigation of marine casualties occurring in the waters of the Canal Zone. 35 C.F.R. 12.6.

3. On August 15, 1954, at 0733 hours the Nonsuco departed Balboa commencing a northbound transit of the Panama Canal. Captain Fred M. Weade, Panama Canal Pilot, had been assigned by the respondent Panama Canal Company as Pilot for the transit and he was in control of the navigation of the vessel through the Panama Canal. Pilot Weade, at the time of transit, had been a Panama Canal Pilot for almost five years. Captain Weade had first gone to sea in 1929 and was licensed master of ocean-going vessels. He had been a master of tugs in the Panama Canal for approximately seven years before becoming a Pilot.

4. The Nonsuco was equipped with neither a rudder-angle indicator nor revolution indicators. Thus, the Pilot had no way of determining whether his orders to the engines and rudder were promptly and properly carried out.

5. The Nonsuco proceeded from Balboa through Miraflores Locks and Pedro Miguel Locks and through the narrow Gaillard Cut which has, in certain "reaches", a channel width of 300 feet. When the Nonsuco entered Mamei Curve she was proceeding at an engine speed of "full ahead", or 7 or 8 knots, along the centerline of the channel. The vessel had handled satisfactorily up to this point and the transit had been without incident. The channel in Mamei Curve is approximately 750 to 800 feet wide, and the sailing line followed by vessels (except in meeting situations) coincides with the centerline of the Channel. A vessel proceeding northbound from Mamei Curve into San Pablo Reach is required to execute a turn of approximately 50 degrees to the right. The channel depths, according to the Panama Canal Annual Survey Chart of July 1, 1954, in Mamei Curve and San Pablo Reach vary typically from 44.3 to 57 feet. According to the Chief of the Hydrographic Section of the Panama Canal Company, the depth of water on the day of the accident was slightly greater then the depths indicated on the chart. Pilot Weade commenced the turn from Mamei into San Pablo Reach with right rudder which he ordered at the customary point for beginning the execution of the turn. To the right of a northbound vessel in Mamei Curve are three small islands outside the channel line. Beyond, and between the islands, and on either side of the channel at the junction of Mamei Curve and San Pablo Reach, there is considerable open water. At the point in San Pablo Reach where a northbound vessel will ordinarily line up on the Northbound Sailing Line after completing the turn, the point of one of these small islands lies approximately 25 to 50 feet outside the prism line. Some slight "bank suction" from the island may be experienced at this point by a vessel such as the Nonsuco, but the effect does not last long since the island is small and whatever effect is felt is lost as soon as the island is passed. A vessel transiting northbound in San Pablo Reach normally follows the "Northbound Sailing Line", offset approximately 100 feet to the East of the axis or centerline of the channel. There is a "Southbound Sailing Line" similarly offset to the West of the axis. The Nonsuco had completed the turn from Mamei into San

Pablo Reach and was swinging slowly to the right when Captain Weade ordered the helmsman to check the swing and to steady on the Northbound Sailing Line. The starboard side of the vessel was, at the time this order was given, approximately 250 feet from the right hand channel boundary, just abeam, and approximately 300 feet from, the point of the small island which lies just outside the channel. The helmsman, in response to the Pilot's order to check the right turn and steady on the Northbound Sailing Line, applied left rudder. The vessel's swing to the right was checked and then the vessel commenced swinging slowly to the left. The pilot ordered "steady" and then "half right" rudder. The swing to the left was not checked. As soon as the Pilot observed that the swing to the left was not checked, he ordered "hard right" rudder but the swing continued. These rudder orders normally should have checked the swing. He immediately ordered "full astern" on the starboard engine. The usual effect of going "full astern" on the starboard engine of a twin-screw vessel while continuing "full ahead" on the port engine is to provide a powerful combination of forces tending to swing the vessel's heading to the right. It is a maneuver commonly used on twin screw vessels to effect a change in heading when response to rudder alone is not adequate. The Pilot observed no improvement in the heading of the bow following the order "full astern starboard engine." The Master of the vessel, who had been absent from the bridge for some time previous to the entry of the vessel into Mamei Curve, arrived on the bridge almost immediately after the "full astern starboard engine" order was given. The Pilot informed the Master that the vessel's engines were not answering, and taking him to the starboard wing of the bridge indicated to him that there was not the anticipated turbulence of water from the starboard propeller. The bridge telegraph indicated that the order had been received in the engine room. The Master himself went to the telegraph and rang "full astern" on the starboard engine three times. (It must have been the "full astern starboard engine" order which the Master was informed of and then repeated on the telegraph, inasmuch as the Master was on the bridge at the time the order "full astern both engines" was given and there would have been no need of the Pilot to have informed the Master of that order). The sheer to port continued and the Pilot ordered "stop both engines," "drop both anchors", and "full astern on both engines" in rapid sequence. There was no noticeable improvement of the attitude of the vessel following the orders to the engines or rudder. The vessel struck the West Bank making approximately 2 knots. The distance over the ground from the point where Captain Weade had ordered "full astern starboard engine" and the point where the vessel struck was approximately 1,900 to 2,000 feet. The Pilot and the Master went to the steering engine room very soon after the striking and observed that the rudder was "hard right", a position coinciding with the last previous rudder order given. In the absence of a rudder-angle indicator, however, the Pilot had no means of determining the time when the rudder had come over, or whether it had come over promptly in response to his order.

6. The only witness produced on behalf of the libelant was the Master whose testimony had been taken by deposition. The Master, previous to the accident, had been in command of the Nonsuco for 13 years and had transited the Panama Canal as Master of that vessel approximately six times each year. He found no fault with any of the orders given by the Pilot and testified that the orders given by the Pilot were the very orders he himself would have given.

7. The Nonsuco during other transits of the Canal, had sheered on numerous occasions while traveling at both high and low speeds, but on such occasions the Pilot had been able to break the sheers in time to avoid an accident.

8. If the Nonsuco had responded normally to the engine orders given by the Pilot, the striking of the West Bank of the Panama Canal would have been averted.

9. The actions and course taken by the Pilot before the sheer occurred were in all respects customary and proper. The Nonsuco made the usual and proper approach to Mamei Curve and the turn was executed in the usual and proper manner. The actions taken by the Pilot when the sheer to port developed were in all respects proper.

10. Under Sec. 7.82 of the "Rules and Regulations Governing the Navigation of the Panama Canal and Adjacent Waters", (35 C.F.R. 4.282) the maximum speed of vessels in 800-foot channels of Gatun Lake is 12 knots and in 500-foot channels of Gatun Lake, 10 knots. The speed of the Nunsuco in Mamei and San Pablo Reaches (both over 700 feet wide) of Gatun Lake never exceeded 7–8 knots.

11. Although a contemporaneous record of bells received in the engine room was apparently kept by the vessel, the libelant failed to produce such record either in response to respondent's "Motion for Discovery and Inspection" or upon respondent's "Notice to Produce" served eight days before trial and the libelant informed the Court "that there was no engine room bell book." The unsigned "Bridge Bell Book" was virtually unintelligible and was in conflict, in several instances where it was intelligible, with entries contained in the "Chief Engineer's Log Book."

12. The "Chief Engineer's Log Book" contained a record of bells purportedly received from 0647 to 1809 hours on August 15, 1954. These entries were not made contemporaneously with the receipt of bells on the engine room telegraph. All of the bell entries in the "Chief Engineer's Log Book" were made by the same person, apparently the same person who subscribed the "Chief Engineer's" Log Book as "First Assistant Engineer." To the right of the bell entries in the Chief Engineer's Log Book is the notation "Maneuvering main engines to bells order as per bell book, while in transit." A record of bells is not customarily kept in a "Chief Engineer's Log Book" and the entries in this case were under columnar headings calling for such information as water temperatures, pressures, engine revolutions, etc. The "Chief Engineer's Log Book" was not itself produced at trial, the libelant only having available a photostatic copy of a single page represented as being a page of the "Chief Engineer's Log Book". The record of bells in the "Chief Engineer's Log Book" shows the receipt in the engine room telegraph of simultaneous engine orders "full astern starboard" and "full astern port" at about the time the sheer to port developed. There is no entry showing that "full astern starboard engine" order was received prior to the receipt of the "full astern port engine" order. This omission is in conflict with the testimony of the Pilot and Third Mate (who testified at the inquiry conducted by the Board of Local Inspectors) that a "full astern starboard engine" was given and that thereafter a "full astern port engine" order was given.

13. The depth of water under the Nonsuco in Mamei and San Pablo Reaches was such that there was no appreciable "bottom-suction" or hydraulic interaction between the hull and the bottom contour of the channel.

14. During the period July 1, 1951 to August 16, 1954 there were 87,210 transits of the Panama Canal by ocean-going vessels. During this time there were 56 groundings and bank strikings in the Panama Canal. Of these 56 vessel accidents, there were (according to a summary-abstract compiled from records of investigations conducted by the Board of Local Inspectors of the Canal Zone Government) 34 accidents attributable to the failure of ship's equipment; 8 accidents attributable to failure of personnel of the Panama Canal; 5 attributable to ship's personnel; 5 were deemed "unavoidable accidents"; 3 resulted

from combined failures of personnel and equipment; and the cause of 1 accident was "undetermined."

15. The possible reasons for temporary rudder failure or failure to bring the starboard engine from "full ahead" to "full astern" are many and varied. The libelant did not offer any testimony of the vessel's engineering personnel in an attempt to prove that such failures did not occur. The vessel's unusual response to rudder and engine orders and the records kept by the vessel suggest strongly that there was a failure on the part of the vessel to execute one or more of the Pilot's orders.

16. At the time and place of the accident, wind and current were negligible and visibility was good. Weather conditions played no part in the casualty.

## Conclusions of Law.

1. This is a suit by the owner of the M/V Nonsuco under section 10(b) of title 2 of the Canal Zone Code, as amended, for damages sustained by the vessel when she grounded in San Pablo Reach on August 15, 1954 while being navigated by a Panama Canal Pilot. Under section 10(b) of title 2 of the Canal Zone Code, as amended, the respondent is liable for injuries which a vessel sustains by reason of the negligence or fault of the respondent or its officers, agents, or employees acting within the scope of employment and in the line of duties in connection with the operation of the Canal.

2. This Court has previously held that a vessel which meets with an accident while transiting the Panama Canal with a Panama Canal Pilot in charge of navigation is sufficiently under the control of the respondent so that when the vessel establishes that it did not cause the accident, the respondent is called upon to explain its conduct. Absent a satisfactory explanation by the respondent, an inference of negligence may be drawn against it. Dreyfus & Cie v. Panama Canal Company, 1954 A.M.C. 652, 656.

3. The libelant did not plead nor did it attempt to prove any specific act of negligence on the part of the respondent but relied upon the doctrine of res ipsa loquitur as enunciated in the Dreyfus case, supra. Moreover, before the respondent could be called upon to explain its conduct, the libelant was required to prove by clear and convincing evidence that its own conduct did not cause the accident. It would be manifestly unfair, and it would be poor judgment, to base an inference on negligence in the instant case on anything less than a clear showing by the libelant that all of the vessel's personnel and complicated mechanisms out of sight of the Pilot functioned properly at all times. Wigmore on Evidence (3rd Edition) Vol. I, Sec. 41 at page 438. The libelant, under this reasoning, was required to demonstrate what it did immediately prior to and during the continuance of the sheer. It cannot be inferred or presumed that the vessel or its equipment functioned in any particular manner. The Domira, D.C.E.D.N.Y.1931, 49 F.2d 324, 328, affirmed, 2 Cir., 56 F.2d 585.

4. The respondent proved convincingly that every aspect of the control which it had over the vessel was exercised with due care both prior to and during the sheer which resulted in the bank striking. Even had the libelant demonstrated its own freedom from fault, the showing made by the respondent was such that an inference that respondent was negligent would not be warranted under the evidence. Richmond Sand & Gravel Corp. v. Tidewater Const. Corp., 4 Cir., 1948, 170 F.2d 392; Dreyfus & Cie v. Panama Canal Company, 1954 A.M.C. 652, 656.

5. The libelant failed to prove by a fair preponderance of evidence that the casualty to the Nonsuco was caused by negligence of respondent. If any inference as to the cause of the accident is to be drawn from the evidence adduced at trial, it is that the accident was proximately caused by a failure, for some unexplained reason, of the vessel's person-

nel to execute promptly the orders of the Pilot.

6. The Court has jurisdiction over the parties and the subject matter of the action.

7. The libel is dismissed with costs to the respondent.