SEAFARER, S.A., as owner of THE S.S. GALLOWAY, Libelant,

v.

PANAMA CANAL COMPANY, Respondent.

No. 4212.

District Court, Canal Zone, Division Balboa.

Aug. 26, 1955.

Van Siclen, Ramirez & de Castro, Ancon, Canal Zone, for libelant.

Paul A. Bentz, General Counsel, David A. Markun, John A. Cooper and Theodore P. Daly, Attys., Office of General Counsel, Panama Canal Company.

CROWE, District Judge.

This is an action for damages allegedly sustained by the owner of the S.S. Galloway as a result of the striking of the West Bank of the Panama Canal in Bas Obispo Reach, near Station 1555, at approximately 1821 hours on May 9, 1955, during a northbound transit. The vessel was proceeding as a toll paying

ship with a Panama Canal Pilot on board as required by 35 C.F.R. 4.22, as adopted by order of the Secretary of the Army, Canal Zone Order 30, January 6, 1953, 18 F.R. 28 (Sec. 4.1 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters, 1952 Edition, as amended and supplemented).

It was stipulated between the parties at the pre-trial conference that the issue of liability was to be tried "separately from and prior to the trial of the issue of damages," and this procedure was followed by the Court and the issue of damages will be left open.

(1) At all material times mentioned in the libel the libelant was the owner of the S.S. Galloway, a vessel registered under the laws of the Republic of Liberia.

(2) The respondent was at all times mentioned in the libel, and is at the time of these findings, a corporate agency and instrumentality of the Government of the United States of America created by Act of Congress of June 29, 1948 (c. 706, sec. 2, 62 Stat. 1076; consisting of secs. 245 to 258 of title 2, Canal Zone Code), as amended by Act of September 26, 1950 (c. 1049, sec. 5 et seq., 64 Stat. 1041).

(3) The S.S. Galloway is a single right-handed screw steam reciprocating Liberty-type cargo vessel with a gross tonnage of 7,242, a net tonnage of 4,444, an overall length of 441.5 feet, a beam of 57.1 feet. The vessel was built in 1943 by the Bethlehem Fairfield Shipyard, Inc., at Baltimore, Maryland. The S.S. Galloway has a mean authorized draft in tropical fresh water of 28'11½". On May 9, 1955, the vessel's draft in Pedro Miguel Locks was 27'2" forward and 29'0" aft.

(4) Captain Howard Buehler, Panama Canal Pilot, was assigned to pilot the vessel through the Canal.

Captain Buehler had sea experience dating back to 1930, having served from that date as sailor, quartermaster, third mate, second mate, chief mate and master of ocean going vessels.

He had command of ocean going vessels as master for three years and then entered the U. S. Navy as an officer where he served on Naval vessels from 1942 to 1946.

In May 1950 Captain Buehler joined the Panama Canal Company as a pilot-in-training and after a period of training, dealing with the problems of piloting vessels through the Panama Canal, he was examined and issued a Panama Canal Pilot's license in March 1951. Thereafter he served as a pilot in the regular employment of the respondent and prior to the date of the accident, May 9, 1955, he had conned more than 400 vessels through the Canal, about 20 per cent of which were "Liberty" type vessels.

(5) The S.S. Galloway was under the command of Captain Konstanty Kowalski, a competent shipmaster with long sea experience and holder of a Polish Master's license, acquired in 1932, and an American Master's license, acquired in 1953.

The competency of the officers and crew was not attacked but the action of the chief engineer in failing to be in the engine room during the passage through the Canal and at the time of the emergency was raised and will be dealt with later in these findings.

(6) There was no indication to the pilot at the time of boarding nor at any time that the Galloway had any peculiar characteristics nor defects that should have been taken into consideration in transiting the Canal.

(7) The Galloway had a screw with an 18½ foot pitch instead of the standard Liberty ship screw with a 16½ foot pitch, which might have caused the speed of the ship to be slightly accelerated but proof of this is uncertain and this fact was not disclosed to the pilot.

(8) The Galloway was not equipped with a rudder-angle indicator nor an engine-revolution indicator. This was noted by the pilot on boarding and reported to the Panama Canal Company.

(9) The maximum speed for vessels passing through Gaillard Cut in the straight reaches, except in an emergency, for vessels of 250 feet or over in length is six knots "(or as near 6 knots as possi-

ble while maintaining steerage way),'' as provided in 35 C.F.R. 4.282, as added CZO 30, Jan. 6, 1953; 18 F.R. 280, Sec. 7.82.

(10) The Galloway arrived at Balboa Road on May 9, 1955, at 1348 and the pilot came aboard at 1356.

The vessel was not stopped at Balboa and it proceeded immediately into the Canal in the direction of Pedro Miguel Locks.

The weather was fine, there was no wind, and the transit to the locks was without incident.

The captain was on the starboard wing of the bridge, the pilot was in the wheelhouse, and the chief mate, Helmut Wilters, was on watch. The wheel was manned by Sigismond Gordon, seaman.

Wilters was a man of long and reputable sea experience who had served as a shipmaster and Gordon had proven to be a reliable and capable helmsman throughout the voyage.

When the pilot came aboard he informed the captain that he would use the usual "20–40–60" rpms (20 revolutions per minute for "slow ahead," 40 revolutions per minute for "half ahead," and 60 revolutions per minute for an order of "full ahead" when ordered by telegraph from the bridge to the engine room). These are standard and are as requested by all Panama Canal Pilots when piloting a "Liberty" type vessel through the Canal. The speed through the water of a "Liberty" type vessel is about 2½ to 3 knots for "slow ahead," about 6 knots for "half ahead," and about 9 knots for "full ahead."

It is impossible for a pilot to determine his actual speed within a knot or two and he must depend upon the standards and the known speed developed at so many revolutions per minute.

During the passage from the time of boarding to the Pedro Miguel Locks the pilot noted that the vessel handled well and responded to all orders and on several occasions he put the vessel at "half ahead" with good results.

The vessel passed through the Pedro Miguel Locks by 1722 Canal Time and 1718 ship time (according to the Bridge Log Book). The pilot rang "half ahead" on the telegraph and proceeded at that speed until reaching Cucaracha Reach where another vesesl was met and the Galloway of necessity was slowed to "slow ahead."

Immediately after passing the vessel the pilot signaled for "half ahead" and they proceeded on through the "Cut" and passed the turn at Cucaracha at 1742 and at La Pita at 1805 according to the respondent's Daily Operating Sheet.

On entering Bas Obispo Reach the pilot maneuvered the vessel into the center of the channel and as it was growing dark he used the range lights to gauge the location of the Galloway. After having proceeded along about ¼ of the Bas Obispo Reach the pilot noticed that the vessel "wobbled" to starboard in the direction of the east bank and to counteract the movement the pilot ordered "port," which was answered by the helmsman with a five degree turn on the wheel, but as the vessel continued to starboard the pilot ordered "more port" about 10 or 20 seconds later. When the vessel still failed to respond the pilot ordered "hard port" and Gordon, the helmsman, found that he could not turn the wheel further and called out to the mate to the effect that it would not move and the mate then jumped to his assistance and was able to turn the wheel to a position of 25 to 28 degrees to port from the position of 18 to 20 degrees held by Gordon at the time the mate grasped the wheel.

When the pilot saw the mate and helmsman struggling with the wheel he started working the ship's telegraph himself (ordinarily the job of the watch officer and in this case the chief mate) and ordered the engine stopped.

In the meantime the captain from his position on the starboard wing of the bridge realized that something unusual was happening and ran to investigate. He then went to the port wing of the

bridge and called to the chief engineer who was sitting on deck outside his office and said, "Run and see. Maybe something is wrong in the steering room."

The chief engineer ran aft to the steering engine room and upon finding nothing amiss called the bridge and reported this to the pilot who answered the phone.

The vessel continued heading toward the east bank and when it attained a position of about 60 feet away the pilot ordered the wheel amidships, which was followed by the helmsman without difficulty.

By this time the ship was strongly affected by bank suction, a reaction that by reason of the ship's movement through the water and the consequent rushing of the waters to fill the vacancy left by the ship in passing causes tremendous pressure on the ship. Due to the unequal distribution of this pressure when the vessel nears a bank the pressure tends to force the vessel against the bank. The pilot ordered "hard right," "slow," and "half ahead" in an attempt to counteract this force but the vessel sheered to the port toward the west bank.

When the vessel sheered toward the west bank the pilot ordered the engines stopped, then full astern and "let go the port anchor," and "hold 2" shots of chain (180 feet). In spite of the last maneuvers ordered by the pilot the vessel continued forward and struck the west bank near the point designated by the Canal Zone engineers as Station 1555 as shown on the Annual Survey Chart. At the time of the striking the Galloway was traveling at an approximate speed of 3 knots.

The striking occurred at about the hour of 1819 or 1820 and damage was done to the bow of the vessel. Tugs were called and the vessel was assisted to proceed to a mooring at Gamboa.

(11) The Galloway had a history of trouble with her steering gear before and after the accident.

Six days before the accident on May 3, 1955, a valve which reduces the steam pressure from the boiler to the steering engine was worked on. Thereafter, on May 5th the helmsman found the wheel on the telemotor hard to operate and it was necessary to adjust the equalizer valve in order to "get her over" past 20 degrees.

The chief mate found it necessary to adjust the equalizing valve on the wheel on one of his watches on the voyage to the Canal just before the accident.

After the accident on May 28, 1955, the reducing valve was worked on and after May 31, 1955, at Newport News Dry Dock the entire steering engine was removed for repairs.

(12) Failure of steam to the steering engine caused by a defective reducing valve or by inadvertent closing of a cutoff valve could produce rudder failure temporarily and such rudder failure would manifest itself in the manner experienced by the helmsman on the Galloway just before the collision. Failure of steam would result in total or partial inability to move the rudder and stiffness in the operation of the wheel.

A failure of the steering engine would create a condition whereby the movement of the wheel would not govern the movement of the rudder and the wheel's position would not necessarily reflect the position of the rudder.

(13) The pilot dropped the port anchor on the theory that it would be of the most benefit in checking the sheer of the vessel in that as the vessel was swinging to port the pull on the anchor had a lateral component tending to swing the vessel to the right. The dropping of the starboard anchor would have afforded less leverage and been less efficient in checking the sheer.

(14) The actions taken by the pilot prior to and subsequent to the steering gear failure were proper in all respects.

(15) The libelant failed to produce any of the Galloway's engine room personnel as witnesses. The Engine Room Bell Book, which the libelant attempted to introduce in evidence at the trial, was not properly authenticated. The entries appearing in the Engine Room Bell Book

did not contain a complete and accurate account of engine orders given by the pilot just prior to and subsequent to the bank-striking.

### Conclusions of Law.

(1) This is a suit by the owner of the S.S. Galloway under section 10(b) of title 2 of the Canal Zone Code, as amended, as added by section 3 of the Act of September 26, 1950, Chapter 1049, 64 Stat. 1038, for damages sustained by the vessel when she grounded in Bas Obispo Reach on May 9, 1955, while being navigated by a Panama Canal Pilot. Under section 10(b) of title 2 of the Canal Zone Code, as amended, the respondent is liable for injuries which a vessel sustains by reason of the negligence or fault of the respondent or its officers, agents, or employees acting within the scope of their employment and in the line of their duties in connection with the operation of the Canal.

(2) The evidence establishes that every aspect of the control which respondent had over the vessel was exercised with due care both prior to and during the sheer which resulted in the bank-striking and that the bank-striking was not caused by any fault of the Panama Canal Company or of its employees. The pilot assigned to control the navigation of the Galloway was in all respects competent.

(3) The failure of the libelant to produce any engine-room personnel warrants the inference that the testimony of such personnel, if produced, would have been unfavorable to the libelant.

(4) The libelant in its libel had charged the respondent with specific acts of negligence, and, in addition, indicated reliance on the doctrine of *res ipsa loquitur*. The libelant failed to prove by a fair preponderance of evidence that the casualty to the Galloway was caused by any of the specific acts of negligence alleged in the libel. On the contrary, the evidence adduced at trial establishes that the accident was proximately caused by a failure of the vessel's steering mechanism and a failure of the vessel's person-nel to execute promptly the orders of the pilot. In the circumstances, the doctrine of *res ipsa loquitur* could not aid libelant's case even if it be assumed that it would otherwise be applicable. Victorias Milling Co., Inc., v. Panama Canal Company, D.C.Canal Zone 1958, 162 F.Supp. 185.

(5) The Court has jurisdiction over the parties and the subject matter of the action.

(6) The libel is dismissed with costs to the respondent.