MARIBLANCA NAVEGACION, S.A., as owner of THE steamship MARIPOSA, her engines, boilers, etc., Libelant

v.

PANAMA CANAL COMPANY, a corporation, Respondent.

No. 4345.

District Court, Canal Zone, Division Balboa.

June 18, 1956.

Hill, Betts & Nash, New York City, and de Castro & Robles, Balboa, Canal Zone, for libelant.

Bentz, Markun, Cooper & Daly, Balboa Heights, Canal Zone, for respondent.

GUTHRIE F. CROWE, District Judge.

### Findings of Fact

1. The S/S Mariposa is a single screw, steam turbine cargo vessel of Liberian registry, 6,113 gross tons, 3,524 net tons, 476.2 feet overall length, 60.7 feet beam, with an authorized tropical fresh water draft of 26 feet 5½ inches. On the day of the accident the vessel was approximately on her marks. The vessel was powered by a main propulsion engine consisting of a steam reciprocating unit and a low pressure turbine unit utilizing the exhaust from the reciprocating unit. The propulsion engine was rated at a total of 4,000 indicated horsepower. At the time of the accident, the vessel was

owned by Mariblanca Navegacion, S. A., and was operated by Chandris, Ltd., London, England, and was northbound in the Panama Canal on a voyage from Vancouver to a port in South Africa.

2. Captain Julius F. Dietz, Panama Canal Pilot, was assigned to pilot the vessel northbound through the Panama Canal. At the time of the accident he had sea experience dating back to 1937. He had served as a cadet aboard United Fruit Company vessels, and was 24 years old when first issued his Master's license. He received his first command of an ocean-going vessel at the age of 25 and thereafter had commanded several ocean-going vessels. At the time of the trial he held a Master's "unlimited license" endorsed for pilotage from Hallets Point to the sea, from Yonkers to the sea, and Hudson River and Port of Newark to the sea, from the Washington Canal and Raritan River to the sea via Raritan Bay, including lower and upper bays of New York Harbor. Captain Dietz had been issued a Panama Canal Pilot's license in April of 1951, after the usual period of training. He held such license until he left the employ of the Panama Canal Company in the fall of 1957. Prior to the day of the accident, June 19, 1955, he had conned some 500 vessels through the Panama Canal. Pilot Dietz was fully qualified to pilot the Mariposa for the transit in question and was in all respects a competent Panama Canal Pilot.

3. On the day of the accident the Mariposa was not equipped with a rudder angle indicator nor an engine revolution indicator. Thus Pilot Dietz had no means of directly informing himself of the position of the vessel's rudder during the transit nor of directly informing himself of the rate or direction of turning of the vessel's engine.

4. On June 19, 1955, at about 9:30 a. m., Pilot Dietz boarded the Mariposa in the Pacific approach of the Panama Canal for the northbound transit. On boarding the vessel he went directly to the pilothouse. There he met the Master of the vessel and the Second Officer,

who was to be Pilot Dietz's interpreter, if necessary, and the helmsman. Pilot Dietz informed the Master that he wanted engine revolutions for 2–3 knots at "slow ahead," 5–6 knots for "one half ahead" and 10 knots for "full ahead." The Master informed Pilot Dietz that the vessel's speed at maximum engine revolutions was 12½ knots. Pilot Dietz ordered the Master to heave the port anchor, which was down, and to have the anchors manned and ready to drop at all times. The vessel proceeded to Miraflores Locks, across Miraflores Lake and through the Pedro Miguel Locks to the southern extremity of Culebra Reach in a highly satisfactory manner under various bells. While in the Gaillard Cut and prior to arriving at the southern extermity of Culebra Reach the Mariposa passed the Yaque, a vessel of about 5,000 gross tons, with a beam of about 55 feet and a length of about 386 feet. The Yaque was lightly laden and the meeting and passing in a 300-foot wide reach of the Gaillard Cut was in all respects normal. While waiting for the southbound Eleni D to make her turn from Empire Reach into Culebra Reach, Pilot Dietz experienced momentary difficulty in maneuvering the vessel at slow speeds with the vessel's bow falling off to port on starboard helm. The vessel had been maneuvered at slow speeds prior to this time, particularly in and around the locks, but had always responded well. To overcome the difficulty Pilot Dietz increased ahead speed on right rudder. The vessel responded and the heading was corrected. Several ship lengths south of the 20-degree left turn from Culebra Reach into Empire Reach the Mariposa met and passed the southbound Eleni D. The Eleni D was about 441 feet in length and about 57 feet in beam. At the time she was lightly laden. (9.7 feet forward, 18.5 feet aft, tropical fresh water.) The meeting and passing, which was in all respects normal, was effected at the widest (in excess of 500 feet) and therefore most advantageous point for passing in the Gaillard Cut. Shortly after the bow of the Mariposa passed the stern of the Eleni D, the Pilot

ordered the rudder placed "a little left." The passing of the stern of the Eleni D by the bow of the Mariposa should have tended to draw the Mariposa's head slightly to the left. Also the vessel's position in the channel at this point brought it closer to the right-hand bank than to the left-hand bank, resulting in some slight bank suction that should have directed the vessel's head to the left. Despite the apparent existence of all these forces (rudder, ship interaction, bank suction) acting in combination to bring the vessel's head to the left, and despite the apparent absence of any force to bring the vessel's head to the right, the vessel continued directly ahead toward the right-hand bank of the bend at the junction of Culebra and Empire Reaches. The Pilot ordered the wheel placed further left by degrees. Ultimately, he was forced to order "full left" rudder and "half ahead" on the engines. The vessel swung suddenly to the left. The Pilot ordered the vessel's rudder placed at "hard right," anticipating the heavy movement that would develop to the left. He ordered the engines "full ahead" and then "jingled" for emergency power. The movement to the left was finally broken and immediately the Pilot ordered the rudder placed at "hard left" anticipating the bank suction from the left or West bank would tend to cause the vessel to sheer across the channel to the right hand or East bank. The Pilot noted that the vessel's heading to the right was not being corrected and again ordered the telegraph "jingled" for "emergency full ahead." At this time the vessel was being held in a state of equilibrium, a balance having been obtained between rudder power and bank suction, i. e., the vessel was proceeding up Empire Reach at a yaw angle with her bow to the right of the axis of the channel and with her stern close in to the West bank. When it became apparent to Pilot Dietz that engine and rudder orders would not correct the vessel's heading and thereby save the vessel, he ordered that the port anchor be let go and the engines be stopped.

The port anchor hung in the hawse pipe. He then ordered the engines "full astern" and ordered the starboard anchor let go. The starboard anchor dropped. Shortly thereafter the vessel struck the East bank of the Canal between Stations 1680 and 1700 at a speed of 4 to 5 knots.

5. The erratic behavior of the Mariposa in not responding to normal amounts of rudder on the turn at the junction of Culebra and Empire Reaches was the result of temporary steering gear failure. Failure of the steering mechanism of the type of gear in question (straight electric) could have been caused by accumulations of dirt or grease or fouling on contact points in the electrical component of the steering system. In such case, dirt or grease could act as an insulator inhibiting the passage through contact points of the relatively low voltage which is produced when the wheel is at small rudder angles. As the voltage increases at larger rudder angles the voltage will break through the dirt or grease or fouling with the result that a surge of electricity suddenly activates the motor which turns the rudder quadrant causing the rudder to move extremely rapidly to the "hard over" position. Such behavior is in contrast to the normally functioning system in which the rudder travels smoothly and evenly to the "hard over" position. The accumulation of dirt and grease as described above is frequent where the maintenance of the steering system is substandard and where a vessel has no one available who is capable of maintaining the equipment. On the day of the accident, the Mariposa did not carry a licensed electrician. Temporary failure of the vessel's steering gear could also have been caused by the accumulation of moisture in cables running from the bridge back to the steering engine. In this connection, the vessel had been in heavy weather prior to arriving in Canal Zone waters.

6. The Mariposa had a history of steering gear difficulties subsequent to

the bank-striking. On July 4, 1955, during the transit following the transit in question, the Pilot in charge of the vessel's navigation noted that the wheel indicator on the steering column was not operating properly. The wheel indicator was subsequently overhauled in October of 1955, at the Amsterdam Drydocking Company. Also, the Mariposa made a transit of the Canal subsequent to the transit in question in April 1956. On this trip, the vessel was equipped with rudder angle indicators. The ship's condition report for this trip noted that when the indicator of the steering wheel column showed 10 degrees left rudder, the rudder itself was amidships. If this condition existed on the day of the accident, it would explain why, with the wheel ordered a "little left" after passing the Eleni D, the Mariopsa continued straight ahead into the right-hand bank of the bend at the junction of Culebra and Empire Reaches.

7. The actions taken by the Pilot prior to and subsequent to the steering gear failure which developed about the time of the meeting and passing of the Eleni D were in all respects proper and in accordance with the practices of good piloting and seamanship.

8. There was a failure of the vessel to promptly and properly comply with the Pilot's order to drop the port anchor. The failure of the port anchor to drop was not explained by the libelant. The prompt dropping of the port anchor by the vessel would have been of material assistance to the Pilot in reducing the vessel's speed, thus minimizing the force of the striking, and could have possibly resulted in avoiding the striking of the East bank.

9. Prior to the arrival of the Mariposa in Canal Zone waters, the turbine feature of her main propulsion engines had been damaged in heavy weather. As a result, the turbine feature of the main engine was disconnected from the propeller shaft and was not operative for the transit. This meant a loss of about 20% of maximum power. Ac-

cordingly, the vessel's engine room did not deliver maximum power when so ordered by the Pilot during the transit. Pilot Dietz was not informed that maximum power would not be available, but, on the contrary was led to believe that the vessel's full power, giving a speed of 12½ knots, would be available.

10. When the Pilot ordered "full ahead" and "emergency full ahead" on the engines and "hard right rudder," in an attempt to break the sheer to port (to the West bank) after the Mariposa passed the Eleni D, the engineers delivered only 60 r. p. m. on the engines. Normally at "full ahead," the engineers would have delivered 70 to 75 r. p. m. For the "emergency full ahead" order, the engineers delivered only 65 to 70 r. p. m. Normally when the telegraph is "jingled," the engineers would deliver the maximum, i. e., over 80 r. p. m. The vessel's engines were originally built to deliver a maximum of 90 r. p. m. The failure of the engine room to deliver a sufficient number of revolutions at this critical period resulted in a delay in the breaking of the sheer to port causing the vessel to come in close proximity with the West bank and thereby causing it to experience heavy bank suction which caused the vessel to sheer radically to the East bank.

11. When the Pilot ordered "emergency full ahead" and "hard left rudder" on the sheer to starboard (to the East bank), the vessel was being held in a state of equilibrium, a balance having been obtained between rudder power and bank suction. At this time, the engine room of the Mariposa delivered only 65 to 70 r. p. m. The engine room at this time should have delivered over 80 r. p. m. If at this time 80 r. p. m. had been delivered by the engine room instead of the 60 to 75 r. p. m. actually delivered, the vessel's rudder force would have been increased a minimum of 31%. Such increase would have broken the balance existing between bank suction and rudder force in favor of rudder force, and the vessel would

have recovered its heading and avoided the bank-striking.

12. When the Pilot ordered "emergency full ahead" in attempting to correct the vessel's heading, the Chief Engineer was not in a position in the engine room to adequately supervise the operation of the vessel's propulsion engines. The engineer who was at the "ahead" throttle did not know what to do when the order for "emergency full ahead" was given; an apprentice engineer was on the "astern" throttle; and the engineer who was handling the engine room telegraph left his post to go for a drink of water. The failure of the Chief Engineer to be in a position where he could properly supervise the operation of the vessel's propulsion engines provides one explanation why the engine room failed to deliver "full ahead" and "emergency full ahead" as ordered by the Pilot.

13. All bridge records of engine orders given by the Pilot were made up some time after the event and were based upon a contemporaneous record of the engine orders kept by bridge personnel on a piece of paper. Libelant failed to produce the "piece of paper" at trial, i. e., the only contemporaneous record of the engine orders given by the Pilot. The vessel failed to produce the original Bridge Bell Book based on the "piece of paper," but merely produced a photostatic copy of what the vessel's witnesses identified as a Bridge Bell Book. The Engine Room Bell Book produced by the libelant contained extensive erasures and alterations of the entries for the period in question. It was impossible for the Court to reconstruct the entries with a view of ascertaining what the entries were prior to the erasures and alterations. Libelant failed to explain the erasures and alterations. The vessel's engineers are in conflict as to the identity of the person who made the entries in the Engine Room Bell Book at and about the time of the bank-striking.

14. The depth of water under the Mariposa in Culebra and Empire Reaches was such that there was no appreciable "bottom-suction" or hydraulic interaction between the hull and the bottom contour of the channel.

15. At the time and place of the accident, wind and current were negligible. "Surge" created by the drawing of water at Pedro Miguel Locks was not established to have had any bearing on the accident.

16. The visibility on the day of the accident had no bearing on the accident.

### Conclusions of Law

1. This is a suit by the owner of the S/S Mariposa under subsection 10(b) of title 2 of the Canal Zone Code, as amended, as added by section 3 of the Act of September 26, 1950, Chapter 1049, 64 Stat. 1038, for damages sustained by the vessel when she struck the East bank of the Panama Canal in Empire Reach on June 19, 1955, while being navigated by a Panama Canal Pilot. Under subsection 10(b) of title 2 of the Canal Zone Code, as amended, the respondent is liable for injuries which a vessel sustains by reason of the negligence or fault of the respondent or its officers, agents, or employees acting within the scope of their employment and in the line of their duties in connection with the operation of the Canal.

2. The evidence establishes that every aspect of the control which respondent had over the vessel was exercised with due care both prior to and during the sheers which resulted in the bank-striking. The bank-striking was not caused by any fault of the Panama Canal Company or of its employees.

3. The Master failed to have the Mariposa's port anchor in a state of readiness for the transit. This was a violation of 35 CFR 4.41. This violation was a "statutory fault" which placed a burden upon the libelant of establishing that the dereliction not only was not the cause of the disaster but that it could not have been. The Pennsylvania, 1873, 86 U.S. 125, 22 L.

Ed. 148; Merritt-Chapman and Scott Corporation v. Cornell Steamship Company, 2 Cir., 1959, 265 F.2d 537. The libelant failed to sustain this burden.

4. The failure of the Mariposa to have her propulsion engines producing maximum power while transiting the Gaillard Cut was a violation of 35 CFR 4.32, 4.41. This violation was a "statutory fault" which placed a burden upon the libelant of establishing that the dereliction not only was not the cause of the disaster but that it could not have been. The Pennsylvania, supra; Merritt-Chapman and Scott Corporation v. Cornell Steamship Company, supra. The libelant failed to sustain this burden.

5. The libelant in its libel indicated reliance on the application of the doctrine of "res ipsa loquitur" but further charged the respondent with several specific acts of negligence. Respondent propounded interrogatories to libelant in an effort to obtain an elaboration of the specific charges of negligence. The libelant answered the interrogatories by unverified answers on July 15, 1957, asserting that it was not presently in possession of facts enabling it to elaborate on the charges of specific negligence. Uultimately, on August 2, 1957, an order was entered precluding the libelant from introducing evidence relevant to such charges. However, no evidence was precluded under the order of preclusion. Libelant, indeed, did not appear to make any strong attempt to prove any act of specific negligence on the part of the respondent. It produced no "expert" to challenge the propriety of any of the Pilot's actions. Libelant apparently relied on the doctrine of "res ipsa loquitur." In any event, libelant failed to prove by a fair preponderance of evidence that the casualty to the S/S Mariposa was caused by any of the specific acts of negligence alleged in the libel.

6. Under the holdings of the Court of Appeals for the Fifth Circuit in the cases of Victorias Milling Co., Inc. v. Panama Canal Company, 1959, 272 F.2d 716, and Panama Canal Company v. Sociedad De Transportes Maritimos, 1959, 272 F.2d 726, the doctrine of res ipsa loquitur is not available to save libelant from its failure to prove its charges of specific negligence. On the contrary, the evidence adduced at trial establishes that the accident was probably caused by a failure of the vessel's steering mechanism and a failure of the vessel's personnel to execute promptly the orders of the Pilot to the engines and anchors. In the circumstances, the doctrine of res ipsa loquitur could not aid libelant's case even if it be assumed that it might otherwise be applicable. Victorias Milling Co., Inc. v. Panama Canal Company, D.C. C.Z.1958, 162 F.Supp. 185, affirmed supra. Considering all of the evidence, certainly this Court cannot say that it is more probable than not that the casualty was caused by negligence of the respondent and this Court would not draw an inference that respondent was negligent even if it considered itself free to apply the doctrine of res ipsa loquitur under the general fact situation presented in this case. Sweeney v. Erving, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815; Bruce v. De Buse Barras Co. (M/V D–14), D.C.E.D.La. 1958, 169 F.Supp. 90, 93.

7. The Court has jurisdiction over the parties and the subject matter of the action.

8. The libel is dismissed with costs to the respondent.