**CHINA UNION LINES, LTD., Mitsubishi International Corporation, et al., Lan Jing-Chau, et al., Armement Deppe, S.A., et al., Appellants,**

v.

**A. O. ANDERSEN & CO., American Cyanamid Company, et al., Appellees.**

No. 21367.

United States Court of Appeals Fifth Circuit.

July 27, 1966.

Rehearings Denied Oct. 7, 1966.

John R. Brown, Circuit Judge, dissented in part.

See also, D.C., 222 F.Supp. 874.

J. Donald Stillwell, D. H. Hinds, Houston, Tex., for Armement Deppe, S.A. and others.

E. V. Greenwood, Joseph Newton, Houston, Tex., James J. Donovan, New York City, for Mitsubishi International.

Robert Eikel, Houston, Tex., E. F. Platow, New York City, Clarence S. Eastham, Houston, Tex., for China Union Lines.

Newton B. Schwartz, Houston, Tex., for Lan Jing-Chau.

Jack Shepherd, Asst. U. S. Atty., Houston, Tex., for the United States.

Joaquin Campoy, New Orleans, La., Newton M. Crain, Jr., Houston, Tex., for Geo. D. Emery Company, and others.

Bryan F. Williams, Jr., Galveston, Tex., Frank G. Harmon, Houston, Tex., for A. O. Anderson & Co.

Donald M. Waesche, Jr., New York City, James E. Ross, Houston, Tex., for American Cyanamid Co.

Adrian F. Levy, Jr., Galveston, Tex., for Todd Shipyards.

Shirley Preston, Galveston, Tex., for Trustee.

Before BROWN and GEWIN, Circuit Judges, and KILKENNY,* District Judge.

KILKENNY, District Judge:

This is the story of another maritime tragedy resulting in heavy loss of life, severe personal injuries and property damage. On November 7, 1961, about 11:00 P.M. the Chinese Ship M/V UNION RELIANCE (RELIANCE), was proceeding outbound, and the Norwegian Ship M/V BEREAN (BEREAN), which was inbound, collided on the east side of the Houston Ship Channel (Channel). The night was clear, the visibility good, with a northerly wind of approximately eight miles per hour. The ships caught fire, the fire aboard the BEREAN was extinguished within a matter of hours, while the RELIANCE remained ablaze, blocking the channel until November 10th when it was towed to and anchored in Galveston Harbor by the United States Corps of Engineers.

THE LITIGATION

After the towage, the United States filed a libel *in rem* against the RELIANCE, seeking the immediate sale of the vessel, the recovery of expenses incurred in removing the vessel from the Channel and in safeguarding her while at anchorage. China Union Lines, Ltd. (China Union), owner of the RELIANCE, filed a petition for exoneration, or limitation of liability, and obtained the customary order prohibiting the

* Of the District Court of Oregon, sitting by designation.

prosecution of claims against the vessel or her owner, except in the limitation proceeding. In the petition, China Union elected to surrender its interest in the vessel and her pending freight to a court appointed trustee. The court appointed a salvage master and authorized him to undertake the steps necessary to extinguish the fire in the vessel's holds and bring her to port to discharge the remaining cargo, preparatory to sale.

In other proceedings, in the same court, China Union filed its libel against the BEREAN. A. O. Andersen & Co. (Andersen), the owner of BEREAN, appeared, claimed the vessel and answered in cross-libel against China Union. Mitsubishi International Corporation, et al, (Mitsubishi), the owners and underwriters of the lost and damaged cargo aboard the RELIANCE, filed a libel against BEREAN and her owner. Likewise, American Cyanamid Company (Cyanamid), the owner of the only cargo lost aboard the BEREAN filed its libel against the RELIANCE. The Consul General of the Republic of China (Consul General), sought recovery for the injuries to, and deaths of, the officers and members of the crew (Lan Jing-Chau) of the RELIANCE against both vessels. Lucy Duncan (Duncan), as widow, executrix and sole beneficiary of Captain Duncan, channel pilot, also killed as a result of the collision, sought recovery against RELIANCE and her owners.

Separate libels were filed directly against Cyanamid, as owner of the BEREAN cargo, by China Union; the owners and underwriters of the cargo aboard the RELIANCE, and various other parties. These libels were filed on the theory that the acrylonitrile carried by the BEREAN, was of such a dangerous nature and propensity as to render the shipowner liable to said parties.

This complexity of libels, with its jungle of issues, was wisely consolidated by the trial judge (judge). Prior to trial, and after hearing, the judge directed payment of certain salvage claims and deferred action on the remainder of such claims pending a decision on the issues of liability.

After trial, and the entry of detailed findings and conclusions, the judge entered an interlocutory decree directing, among other things, that:

(1) the petition of China Union for exoneration from, or limitation of, liability be denied;

(2) reimbursement be made to the trustee, out of funds in the Registry of the Court, for the trustee's reasonable expenses, including trustee and attorney fees;

(3) payment be made of the claim of the United States from funds remaining in the Registry of the Court in the sum of $27,219.38, with interest;

(4) China Union recover nothing from the cargo of the RELIANCE as general average;

(5) the order theretofore entered enjoining prosecution of litigation against China Union on any claim growing out of the collision be vacated;

(6) China Union recover nothing against respondent Andersen or the BEREAN, that its libel be dismissed with costs and that Andersen, as cross-libelant, recover from RELIANCE and cross-respondent, China Union, the damages sustained by it in consequence of the casualty;

(7) Mitsubishi, and other such libelants, the owners of parcels of cargo on the RELIANCE, recover nothing against the BEREAN or her owner Andersen or Cyanamid, and that such libel be dismissed with costs;

(8) Cyanamid recover from the RELIANCE and her owner China Union the damages sustained in consequence of the casualty, and that the cross-libel by China Union against Cyanamid be dismissed with costs, together with any other intervening libels or cross-libels against that company be dismissed;

(9) the Consul General, representing the next of kin of the dead Chinese seamen and those that were injured, recover nothing against BEREAN or Andersen, and that the libel be dismissed;

(10) the representative of the deceased and injured crewmen recover from the RELIANCE and her owner China Union, all damages sustained by each of them, less one 15% reduction for contributory fault.

(11) Lucy Duncan, the surviving wife of Captain D. O. Duncan, recover from the RELIANCE and her owner China Union, such damages as sustained by reason of the death of her husband.

(12) Armement Deppe, owner of the SS LUXEMBOURG, recover nothing from the BEREAN or her owners Andersen & Co.

China, Mitsubishi, the Consul General of the Republic of China, and Armement Deppe, S.A. appeal from the decree.

## FINDINGS

The detailed findings and conclusions of the judge occupy twenty-five pages of the record. Putting aside certain background material and formalities of no particular significance on this appeal, the judge, after a trial of approximately one month, found that the following facts, with others to be later discussed, were supported by substantial evidence.

## THE VESSELS

The RELIANCE was a steel motor ship, built in the United States in 1940, approximately 496 feet in length and designed for the carriage of dry cargo. The ship's engines were designed to give approximately 240 revolutions per minute which, with the existing gear ratio should give approximately 80 revolutions per minute to the shaft. However, by reason of age, wear and poor maintenance, the engines were not capable of producing this efficiency. To change the direction in which the power is imparted to the propeller shaft, it was necessary to stop the engines by cutting off the fuel supply, then change the cam setting and restart the engines. The design permitted and, for that matter, contemplated one pair of engines to be kept running ahead and the other pair to be kept running astern at all times while the vessel was in pilot waters. When desirable all four engines could be coupled to the shaft to give maximum power either ahead or astern. This was neither a difficult nor a time consuming operation and could be accomplished by competent engine room personnel in a matter of approximately one minute. She was equipped with a hydraulic steering system, located in the steering engine room, not in the main engine room. Hydraulic rams, equipped with fluid under great pressure, actuated the rams and served to move the rudder in the desired direction. Two separate steering systems were available to force the fluid through the system and against the rams, while one was in use the other served as a stand-by. The principal unit of the steering system was a large pump powered by an electric pump utilizing a 50 h.p. electric motor. A number of auxiliary pumps and motors were available, but only a so-called "replenishing" pump was of any importance. In normal operation the hydraulic fluid escaped from the system and was collected in the sump tank, then lifted by means of the "replenishing" pump to an overhead replenishing tank from which, by gravity, it was fed back into the system for further use. This pump was powered by a small electric motor. Approximately 35 gallons of fluid was required to fill each system. While minor leaks were expected, in normal operation only small quantities of fluid should be required at quite infrequent intervals.

The BEREAN was built in Norway and delivered to her owner in April, 1961. She was 508 feet in length, powered by one 9000 h.p. diesel engine. Her navigating bridge is in the forward part of the afterhouse, some 350 feet from the bow. Her cargo space is divided into 42 tanks, designed and equipped to carry many varieties of bulk liquids. She had been engaged in the chemical trade for several months following her construction and prior to the collision, carrying various kinds of petroleum products and other flammable liquids. The skin of the ship constituted the outer wall of certain of her wing tanks. These

tanks were not protected by cofferdams or other protective voids.

## CARGOES AND MOVEMENTS PRECEDING THE CASUALTY

Following her purchase in April, 1961, from Greek interests, the RELIANCE sailed from Greece, through the Mediterranean to Tampa, Florida, and thence to New Orleans. There, her captain and crew had full knowledge of the fact that extensive repairs were needed in the engine room, in particular the overhaul of the engine control department. An officer of the petitioner and a marine surveyor flew from New York to New Orleans to supervise these repairs. While those repairs were underway, the main engines were opened and found badly worn and eroded. Since repairs were not readily available the old heads were re-installed. A full report was made to the owners of the work and other work which was recommended by the marine surveyor to place the engine room in proper condition. Departing New Orleans the RELIANCE proceeded to Houston, thence through the Panama Canal, thence to Japan and Taiwan, where additional engine repairs were made. There, her captain, chief engineers and others of her crew were replaced and the officers and crew who were aboard at the time of the casualty took over. She discharged a part of her cargo at Los Angeles and there received five of the number of piston heads that were needed to properly repair her main engines. However, the heads were not installed. She arrived in Houston on November 5th, discharged part of her cargo and left the Houston dock at 6:30 P.M. November 7th. Unassisted by tugs, she proceeded outbound, with Channel pilot Duncan at her bridge. At approximately 8:30 P.M. while she was in the vicinity of Adams Terminal, she suffered a failure of the starboard steering system, which was in use at the time. The engines were stopped, the anchors were dropped and the vessel brought to rest. Both the starboard and port steering systems were disconnected. After a test had shown that the port system was operating properly, the anchors were lifted and the vessel got underway at approximately 9:00 P.M. Her crew then attempted to repair the starboard steering system. On examination, it was found that the brushholder on the electric motor which operated the starboard steering pump was out of order. The chief electrician repaired the damaged part, but did not replace the part in the engine. As a result, the starboard steering system was not thereafter in operation. Apparently the port steering system was functioning properly until she started across the channel.

On November 6, 1961, the BEREAN loaded 1400 tons of acrylonitrile in Good Hope, Louisiana. The officers of the vessel directed that the cargo be placed in the forward most cargo tanks. Acrylonitrile is similar to gasoline in its burning and explosive characteristics. A distinguishing feature is that it gives off highly toxic fumes. The fumes, in relatively weak concentrations, will cause illness to a person exposed over a long period of time. A single exposure may cause illness or death if there is a sufficiently high concentration of the material. The symptoms of poisoning are similar to those of cyanide. Under Coast Guard Regulations (Regulations) acrylonitrile was, at the time of the casualty, and still is, classified under Regulations as a Grade C flammable fluid, as is gasoline, benzine, naphtha and other such products. The BEREAN also carried a mixed cargo of other bulk liquids. She arrived at Galveston Bar at approximately 9:15 P.M. on November 7th. Channel pilot Lary boarded her and assumed active control of her navigation as she proceeded inbound toward Houston.

From the sea buoy to the point of collision, and beyond, the channel passes through the open waters of Galveston Bay. The channel was dredged to a depth of 36 feet and a width of 400 feet, and is relatively straight as it crosses the Bay. It was the custom and practice of most vessels, in favorable weather, to navigate this portion of the channel at

"full ahead," except when passing other ships. From the sea buoy to the point of collision, pilot Lary, the second mate and a helmsman were on the BEREAN'S bridge. Her captain was on the bridge a major portion of the time, although he was in his cabin before the emergency. He returned to his bridge only moments before the collision. The helmsman was relieved at the wheel every hour on the hour. It was his duty to proceed to the bow of the ship to serve as a lookout for another hour, before returning to duty at the wheel. However, when weather and visibility were good and the vessel was proceeding routinely, it was the custom and practice for the helmsman to have a 10 to 15 minute "coffee break" after leaving the wheel before proceeding to the bow. It was during this interval that the emergency arose. Normally, in passing through the area being navigated by the BEREAN, it was not customary to have an anchor watch standing by, in that there was no occasion to use an anchor to maneuver until after reaching Morgan's Point, some distance inward.

## THE COLLISION

The RELIANCE was navigating at a speed of 9–10 knots over the ground, when she made the bend at Five Mile Point. Each vessel saw the lights of the other about that time. BEREAN blew a one blast signal, which was not answered by RELIANCE. In negotiating the bend, RELIANCE navigated somewhat to her starboard side of the channel. The pilot of the BEREAN noted and commented upon this maneuver. However, the maneuver was, to them, of little significance and did not cause the vessel to sheer away from the starboard bank, nor did it result in loss of control of her steering. In making the turn the RELIANCE pilot ordered her rudder five degrees to port. The rudder responded to the movement of the wheel and the vessel started to turn to port. At this highly important point, the steering gear of the RELIANCE failed; with the frozen rudder in a five degree port position. The quartermaster was unable to move the wheel in either direction and she continued to swing under that rudder setting. Thereafter, she did not straighten her course. After her captain, pilot and quartermaster determined that the wheel would not respond, her bridge notified the engine room to reduce speed and shortly thereafter to stop. On watch was the third mate who was ordered by the captain to find the chief engineer and advise him of the rudder failure. Her engine room was directed to give full speed astern. The pilot of the RELIANCE, recognizing the imminent danger, ordered her first starboard anchor to be dropped and shortly thereafter ordered her port anchor dropped. At this point, approximately 11:00 P.M., the RELIANCE sounded three blasts on her whistle. This was the only whistle signal she sounded. Efforts to transfer the steering control on her bridge from the telemotor system to the gyro-pilot failed and she continued to swing to her port, completely out of control. Prior to the emergency the RELIANCE'S four engines had all been coupled for maximum forward speed. Under orders for full power astern, the engine room reversed one set of two engines and coupled the same to the propeller shaft to give astern power. This, however, did not control the vessel's swinging to port, with some headway and she continued to have headway until she collided with the port side of the bow of the BEREAN. The remaining two engines were never reversed and coupled to the shaft. The other findings, with reference to fault, lack of fault, privity and other issues, we shall discuss in connection with the assignments of error.

## CREDIBILITY OF WITNESSES

The judge noted that several of the principal witnesses for the petitioner were impeached in connection with subjects of great importance. He pointed to the withholding of an important report by the petitioner, which report had received the approval of the captain. The report was entirely inconsistent, in a number of important respects, with the

theory advanced by the RELIANCE. He also pointed to the impeachment, on important testimony, of the chief engineers and chief electrician of the RELIANCE.

## ASSIGNMENTS OF ERROR

Putting aside, for later discussion, the claims against Cyanamid and the claim of the United States, we summarize the assignments of error in the ensuing fashion:

I. That the judge erred in exonerating the BEREAN, because the record shows that she failed to stop, blow proper signals or proceed with caution after she first recognized that there was a risk of collision.

II. That the judge erred in exonerating the BEREAN, when the record shows that she failed to proceed at a moderate rate of speed on meeting a vessel that she was to pass.

III. That the judge erred in exonerating the BEREAN, when the record shows that she failed to keep a lookout on the bow or a proper lookout on the bridge.

IV. That the judge erred in exonerating the BEREAN, when the record shows that she failed to have an anchor watch and failed to drop her anchors.

·V. That the judge erred in exonerating the BEREAN, when the record disclosed that she was unseaworthy and at fault for transporting a poisonous, explosive and flammable cargo in her forward wing tank, next to the skin of the ship.

VI. That the judge erred in denying petitioner limitation of liability under 46 U.S.C. § 183(a), against all claims made against it.

VII. That the judge erred in holding the petitioner and RELIANCE liable for loss and damage by fire to the RELIANCE cargo, because the fire originated from the other vessel and because petitioner, as a carrier, was exempt from such liability under the Bills of Lading and by virtue of 46 U.S.C. § 1304(2) (b), and 46 U.S.C. § 182.

## ASSIGNMENT I

I. On this assignment, appellants charge that the BEREAN violated two of the Inland Rules [1] in failing to stop, blow proper signals or proceed with caution after she first recognized, or should have recognized, that there was a risk of collision.

■ It is contended that the BEREAN violated Rule I, when she (1) blew a one blast signal, proposing a port-to-port passing at a time when those in charge were in doubt as to the feasibility of such a passing, and (2) turned right two or three degrees before receiving a reply to her one blast signal. Rule III was violated, say appellants, when the BEREAN failed to blow a danger signal and reverse her engines immediately upon seeing the RELIANCE in a position that might force her to sheer across the channel. Practically all of appellants' arguments on this assignment are based on an assumption that the RELIANCE, did sheer off its starboard bank and that such fact was observed, or should have been observed, by Pilot Lary of the BEREAN. The judge saw and observed the witnesses and chose to believe Lary's version of what occurred and the reasons for his action, or lack of action, at the time. While Lary observed the position of the RELIANCE when the vessels were approximately one mile apart, he had no feeling that a collision was imminent until he heard the whistles of the RELIANCE and the sound of the anchor letting, at which time he recognized an emergency and gave a full speed astern on the BEREAN'S engines and a hard right rudder to put her aground in the mud bank at his starboard side of the channel. On these issues, the judge found that each vessel saw the other when the RELIANCE was making the bend at Five Mile Point, at which time they were approximately three miles apart. The BEREAN blew a one blast signal which was not answered by the

1. 33 U.S.C. § 203, Rule I.
 33 U.S.C. § 203, Rule III.

RELIANCE. In negotiating the turn the RELIANCE navigated somewhat to the starboard side of the channel. This maneuver was noted and commented upon by Lary, but he considered it of little consequence. The maneuver did not cause the RELIANCE to sheer away from the starboard bank, did not cause loss of control of steering and did not precipitate the casualty. Prior to sighting the RELIANCE, approximately three miles away, the BEREAN had been navigating at "full ahead" and making thirteen to fourteen knots. On observing the RELIANCE coming out of the bend, the BEREAN'S speed was reduced to one-half and shortly thereafter to "slow ahead." It was at this time that the one blast signal was given by BEREAN. While the one blast signal was not answered, Lary fully expected to make a normal port-to-port passing. He was somewhat apprehensive after watching the RELIANCE swing to port and turned the BEREAN slightly to starboard, still expecting to negotiate the port-to-port passing. Lary's order for full speed astern on the BEREAN'S engines and a hard right rudder were put in immediate effect. At this time the vessels were approximately one-fourth of a mile apart and closing on each other. The judge found that the BEREAN took every reasonable means to avoid the collision after her pilot became aware of the danger and that the BEREAN was not at fault in failing to undertake a starboard-to-starboard passing. The judge found that she had no reason to anticipate that such a maneuver might be called for until long after the time had elapsed in which such a passing might have been accomplished in safety. These findings are fully supported by the record and, in particular, by the testimony of the Pilot Lary and the Mate Haugen. The piercing searchlight of hindsight, so skillfully employed by counsel for appellants, may point to other maneuvers that might have been taken successfully by the BEREAN. However,

both we, and the judge, must interpret the record from the viewpoint of a prudent pilot under the circumstances then and there existing. Lary's conduct must be judged with reference to the circumstances at the time and not by a cool estimate of possible danger which might be formed after the event.

It is conceded that vessels, in this channel, are required to pass port-to-port—that meeting vessels must approach each other and pass by turning to starboard two or three degrees. This is in line with a judicially recognized custom in the channel. Royal Navy of Italy v. Standard Oil Co. of N. J., 27 F.2d 331 (5th Cir. 1928). The cases cited by appellants, on this assignment, simply do not support their position. For example, the decision in The Sandmaster, 105 F.2d 1009 (2d Cir. 1939),[2] dealt with a situation where the Inland Rules and a special statute were confused by the pilot; this confusion led to a collision involving three vessels. The judge there held that the narrow channel rules did not apply to a section of the East River, near Brooklyn Bridge, but that navigation in that section was governed by the East River Statute. Obviously, that decision is of no assistance. On the other hand, the case on which the lower court and BEREAN rely, Victory-Plymothian, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897), is of compelling significance. The facts in that case are almost identical with the facts in this record. A lengthy discussion of that decision is unnecessary. It is enough to say that the decision is in full and complete support of the findings and conclusions of the judge on this issue. Other cases cited by appellants, such as Richard J. Barnes, 111 F.2d 294 (2d Cir. 1940); A. H. Bull S. S. Company v. United States, 34 F.2d 614 (2d Cir. 1929); Melrose-Sandcraft, 237 F.2d 884 (2d Cir. 1957), and others, involved crossed signals or a change of course of one of the vessels. Those cases are no more in point than the Sandmaster, supra. We conclude

2. For factual statements see District Court opinion, 26 F.Supp. 64. This decision is reported sub nom Construction Aggregates Co. v. Long Island R. Co.

that the findings and conclusions of the judge, on this issue, are supported by substantial evidence.

## ASSIGNMENT II

■ Appellants charge BEREAN with failing to proceed at a moderate rate of speed on meeting the RELIANCE, in violation of 33 C.F.R., § 207.-180(e) (3) (ii).[3] Appellants theorize that the BEREAN kept traveling at full speed ahead long subsequent to the time when, on seeing the RELIANCE in a position on the bend from which it was likely to sheer, she should have reduced her speed and reversed her engines. The judge's findings are in direct conflict with appellants' assertions. He found that the BEREAN observed the RELIANCE as she was in the turn of the channel about three miles away. Prior thereto, the BEREAN had been navigating at full ahead, or approximately 13 to 14 knots. On observing the RELIANCE coming out of the bend, the BEREAN'S speed was reduced to "one-half" and shortly thereafter to "slow ahead." At this time the BEREAN gave the one blast signal, which was not answered by the RELIANCE. True enough, the pilot and watch officer of the BEREAN observed the RELIANCE somewhat close to her starboard bank of the channel and watched her swing to port, at which time they became somewhat apprehensive. The BEREAN, at this time, turned slightly to starboard. However, it was not until the BEREAN heard the three blast signal from the RELIANCE, and heard the sound of the anchor letting go, that the pilot of the BEREAN recognized an emergency. He forthwith blew three blasts in return, immediately ordered full speed astern on the BEREAN'S engines and gave her a hard right rudder, intending to put her aground. Compliance with these orders was immediate. The vessels were then closing on each other. There is nothing in the record on which the judge could find that a speed of 13 to 14 knots was not proper in the Channel. For that matter, appellant Mitsubishi practically concedes that such a speed below Morgan's Point would not be a negligent act. In any event, the district court has resolved the issue against the appellants and, in our view, such a resolution is not clearly erroneous. A prudent speed, under the circumstances, was an issue of fact for the judge, Socony-Vacuum Oil Co. v. Smith, 179 F.2d 672 (5th Cir. 1950).

Appellants' citations do not fit our facts. For instance, take Wm. A. Paine, 39 F.2d 586 (6th Cir. 1930), cited by China Union in support of its contention that BEREAN was guilty of statutory fault in proceeding at 13 to 14 knots. The Paine involved an interpretation of certain regulations governing the speed of vessels through Maumee Bay Channel in the Great Lakes area. The regulation prescribed a speed of 10 miles per hour. Here, our regulation makes no mention of a maximum speed. There is no statutory speed limit in the channel applicable to the area of the collision. At the time of the collision in Ditmar Koel, 65 F.2d 555 (5th Cir. 1933), the rules and regulations governing the use of the channel provided for a maximum speed of 8 miles per hour. There, the judge held that a speed of 9 knots was excessive and this circuit upheld that finding. The statutory speed of 8 miles per hour was repealed by the adoption of the present rules. Additionally, the channel has been enlarged in depth and in width since the Ditmar Koel decision.

■ Since we cannot say that the findings of the judge were clearly erroneous, we are governed by them. Atkins v. Lorentzen, 328 F.2d 66 (5th Cir. 1964). The decision in George H. Jones, 27 F.2d 665 (2d Cir. 1928), does not nullify the force or effect of the judge's findings against appellants on this issue.

## ASSIGNMENT III

■ Appellants say that the BEREAN failed to keep a proper lookout from

3. "A vessel shall reduce its speed sufficiently to prevent any damage when approaching another vessel in motion or tied up, * * *."

the bridge, as well as from the bow, and in· so failing, violated Article 29 of the Inland Rules, 33 U.S.C. § 221.[4] On this issue, the judge found that the BEREAN was at fault in failing to have a lookout on the forecastle head from 11:00 P.M. until the time of the collision. After so finding, the judge went on to hold that this failure did not, cause, and could not have caused or contributed to, the collision. The judge found that Pilot Lary saw the RELIANCE several miles away and observed her lights constantly thereafter, and that, by reason of his familiarity with the channel, he recognized the danger at the earliest possible moment, under the then existing circumstances. He heard the only whistle given by the RELIANCE and took immediate action. During this period, Pilot Lary, the second mate and a helmsman were on the BEREAN'S bridge. Her captain was on the bridge a majority of the time. He had gone to his cabin shortly before the emergency and returned to the bridge only moments before the collision. It was the helmsman's duty to proceed to the bow of the ship to serve as a lookout for one hour after being relieved at the wheel and ·before returning to duty. However, a general practice was followed on the BEREAN, which permitted the helmsman a 10 to 15 minute coffee break after leaving the wheel and before proceeding to the bow, if weather and visibility permitted and the vessel was proceeding routinely. It was during this interval that the emergency arose. Both bow anchors of the BEREAN were ready to let go, but she had no one standing by the windlass to serve as an anchor watch. By reason of the nature of the channel in that area, it was not customary to have an anchor watch standing by, because normally there was no occasion to use an anchor to maneuver until reaching Morgan's Point. Other findings go into considerable detail on the issue of lookout.[5] The judge found that a lookout "could have done nothing more" than was done by the pilot of the BEREAN under the same circumstances and conditions.

Appellants' proctors, again in the brilliant light of considered hindsight, have carefully reconstructed the events leading up to the collision and argue that Pilot Lary could not have seen what happened and that the absence of a bow lookout was, in fact, causative. It is fundamental that the judge did not have to accept a theory adopted by counsel, as against the positive testimony of Pilot Lary, the watch officer Haugen and tug captain Starkweather. It is argued that the location of the RELIANCE'S anchors, following the collision, demonstrates that she moved extremely close to her port bank at the time her starboard anchor was dropped and that she then moved back toward the center of the channel before the port anchor was dropped. This argument shows the resourcefulness of appellants' proctors, but it does not prove that a bow lookout would have been of aid to the BEREAN. Obviously, the judge had more faith in the channel course, as shown by the RELIANCE'S instruments, than in post casualty theories, advanced by proctors.

---

4. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry light or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

5. "16. At 11:00 p. m. on the night of November 7, 1961, in this area the visibility was good, the night clear, with a slight flood tide running, with the wind northerly at approximately 8 miles per hour."

"21. Recognizing the imminent danger, the pilot of the UNION RELIANCE ordered first her starboard anchor dropped, and shortly thereafter her port anchor dropped. At this point (approximately 11:11 p. m), UNION RELIANCE sounded three blasts on her whistle. This was the only whistle signal sounded by UNION RELIANCE."

"37. I find that BEREAN took every reasonable means to avoid the collision after her pilot became aware of the danger."

Furthermore, the judge could well have believed the testimony that the position in which the starboard anchor was found did not indicate that this was the position of the anchor at the time it was first dropped. Again, we observe that the judge had an opportunity to see and observe the witnesses. We are satisfied with his analysis of the evidence. His finding that the failure to have a lookout did not cause and could not cause or contribute to, the collision is supported by substantial evidence.

The Pennsylvania, 86 U.S. (19 Wall. 125, 22 L.Ed. 148 (1873)), and other cases cited by appellants, do not compel a different result. Appellants would have us give birth to a rule, that every vessel guilty of a statutory fault has the burden of establishing that its fault could not, by any stretch of the imagination, have had a causal relation to the collision, no matter how speculative, improbable or remote. The Pennsylvania does not go that far and this court so stated in Compania De Maderas v. The Queenston Heights, 220 F.2d 120 (5th Cir. 1955), cert. denied 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955). Appellants' reliance on G. B. Zigler Co. v. Barker Barge Line, 167 F.2d 676 (5th Cir. 1948), and Smith v. Bacon, 194 F.2d 203 (5th Cir. 1952), place them on tenuous grounds. The decisions in Zigler and Bacon have been molded and placed in proper perspective by later decisions in Parker Bros. & Co. v. De Forest, 221 F. 2d 377 (5th Cir. 1955), and Atkins v. Lorentzen, supra. Nor can appellants go outside the circuit and find comfort in authorities such as Esso Standard Oil Co. v. Oil Screw Tug The Maluco, 332 F.2d 211 (4th Cir. 1964), or Circle Line Sightseeing Yachts, Inc. v. City of New York, 283 F.2d 811 (2d Cir. 1960). In Maluco the pilot, in contrast to our situation, could not see the lights or maneuvers of the approaching vessel. If, in Maluco, the judge had found that the pilot of the vessel saw everything which a bow pilot lookout could have seen, un-

doubtedly, the Fourth Circuit would not have reversed. The basic holding in that case was that the tug's general lookout was inadequate and that a special lookout was needed.[6] The most that can be said of Maluco is that failure to maintain a lookout is not the equivalent of statutory fault, but does give rise to a strong influence that such failure contributed to the incident and imposes on the vessel a heavy burden to show, by clear and convincing evidence, that it did not so contribute. Here, the judge's findings and conclusions were within the permissible limits of that decision. We feel that the decision of the same circuit in United States v. SS Soya Atlantic, 330 F.2d 732 (4th Cir. 1964) (1964 A.M.C. 898, affirming 213 F.Supp. 7, 1964), rendered a few days after Maluco, is more applicable to the case before us. There, the court held that the district court findings were binding unless clearly erroneous and that the absence of a lookout, having no other duties, is not a basis for a finding of fault if the bridge actually observes what a lookout should have seen. One of appellants urges that no one aboard the BEREAN was serving as a lookout solely in such capacity and without other duties to distract him. Circle Line Sightseeing Yachts, Inc. v. City of New York, supra, is cited. The distinguishing feature of Circle Line is that the lower court failed to make a finding on whether the lookout, with no other duties, could have seen the bridge earlier and either avoided the accident or, at least, diminished its severity. Here, as previously mentioned, the trial court found, as a fact that the absence of a bow lookout not only did not cause the collision, but could not have caused or contributed to it.

A discussion and analysis of other cases cited by appellants, such as The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); The Felix Taussig, 5 F.2d 612 (9th Cir. 1925), cert. denied 269 U.S. 560, 46 S.Ct. 21, 70 L.Ed. 412 (1925); Poling Russell Inc. v. United

6. "But if a special lookout was not needed, the tug must plead the adequacy of her general lookout in order to meet her burden." 332 F.2d 214.

States, 196 F.2d 939 (2d Cir. 1952), and River Terminals Corp. v. United States, 121 F.Supp. 98 (E.D.La.1954), would add nothing to the enlightenment of the profession nor to the validity of our conclusions.

The question of a proper lookout is one of fact to be determined from all of the circumstances on the basis of common prudence, there being no fixed requirement that a vessel maintain a "bow lookout" under the facts and circumstances here presented. The finding of the trial judge on this issue was clearly within the realm of reason. The evidence established beyond doubt that the absence of the bow lookout had nothing whatsoever to do with the collision.

## ASSIGNMENT IV

The appellants claim that the judge erred in exonerating the BEREAN, when the record shows that she failed to have an anchor watch and failed to drop her anchors.

The record supports the judge's finding that the BEREAN was not at fault in failing to have an anchor watch prior to or at the time of the collision, or in failing to drop her starboard anchor as ordered by her pilot. The evidence is clear that it was not the custom of the ships to maintain an anchor watch in the portion of the channel in question, particularly when the vessel had sufficient power, as the BEREAN had, to readily maneuver. Furthermore, the judge found that even if the anchor of the BEREAN had been dropped when her pilot ordered, this procedure would have had little, if any, effect on slowing the vessel and would not have prevented the collision. In other words, BEREAN took the quickest and most certain method of losing headway by running aground. The record shows, and the judge found, that when the BEREAN'S pilot recognized the emergency and ordered the engines full astern and a hard right rudder, he likewise ordered the starboard anchor dropped. The starboard officer who was on the bridge with the pilot immediately started to obey the order. Before he reached the bow he felt the BEREAN go aground and observed the RELIANCE bearing down on the port bow of his vessel in a manner which presented an inevitable collision. For that reason, he did not try to drop the anchor. The BEREAN ran aground on her starboard side of the channel, either immediately before or at the time of the impact. At such time, she had little, if any, headway. Likewise, the RELIANCE had lost most of her speed at this time. Appellants' argument that if the BEREAN had an anchor watch, he could have forthwith dropped the anchor and thus stopped the BEREAN and avoided the collision, is directly opposed to the findings of the judge. There is little, if any, evidence to support this argument. For that matter, the great weight of substantive evidence is against such a contention. The dropping of an anchor when a vessel is making 8 or 9 knots would, on the record, violate good seamanship. Most of the experts were of the view that the dropping of an anchor or anchors from a vessel proceeding to five knots or more, with a view of stopping or even slowing the vessel, would be highly dangerous and probably futile. Such a maneuver would burn the brake bands and at a speed of 8 to 10 knots would result in breaking the anchor chain. No witness testified that he ever dropped an anchor under such circumstances. The expert testimony on this subject was not only convincing, but was in line with what would seem to be good common sense.

Typical of the cases cited by appellants are The Virginia, 25 F.2d 623 (2d Cir. 1928); River Terminals Corp. v. United States, supra, and the Mariblanca Navegacion, S. A. v. Panama Canal Co., 182 F.Supp. 369 (D.C.C.Z.1956), aff'd 298 F.2d 729 (5th Cir. 1962). As applied to the facts of this cause, those cases give us nothing of substance. Mariblanca involved a defective steering gear and failure to drop anchors in the Panama Canal. That area is governed by a specific statutory requirement that anchors be in a state of readi-

ness for letting go.[7] There, the judge held that the accident was caused by a failure of the vessel's steering mechanism and by failure of the vessel's personnel to promptly execute the orders of the pilot with respect to the engines and anchors. In the final analysis, this case merely stands for the proposition that an appellate court will not set aside the finding of a judge unless "clearly erroneous." The Virginia involved a "comedy of errors." The third officer was sent forward to let go an anchor, but dropped the wrong anchor. This required the third officer to run forward to the forecastle head and drop anchor. This he did, but dropped the starboard instead of the port anchor thereby pulling the vessel so that she sheered directly toward the ship with which she collided. The appellate court, on this issue, merely affirmed the finding of the judge. Following the same pattern is the decision in *River Terminals Corp.*, supra. There, the judge found that the dropping of anchors might have avoided the collision—that the failure to drop them was at least a factor contributing to the casualty.

A discussion of other cases cited by appellants would only lengthen an opinion which, with much left to be said, is already beyond the Pale.

### ASSIGNMENT V

China Union, and Lan Jing-Chau, et al charge that the BEREAN was unseaworthy by reason of dangerous cargo being placed in a forward wing tank, next to the skin of the ship. This assignment is related to, but must be distinguished from, the assignment of these appellants that Cyanamid was at fault in failing to warn the BEREAN of the lethal qualities of the cargo. Later, we shall treat of that charge and of China Union's standing to raise these questions.

As early as 1871 the Congress took an interest in legislation on dangerous articles or substances in commerce.[8] The legislation in effect at the time of the casualty[9] empowered and directed the commander of the Coast Guard, in order to secure effective provisions against the hazards of health, life, limb or property created by explosives or other dangerous articles or substances, to, by regulation, define, describe, name and classify all explosives or other dangerous articles or substances and to establish such regulations as might be necessary to make effective the provisions of the section with respect to the descriptive name, etc.[10] The legislation further provided that the transportation, stowage or use of such articles or substances should be in accordance with the regulations. These statutes, and the regulations promulgated thereunder,[11] make it clear that the duty is placed on the Coast Guard to properly examine, analyze and classify all cargoes such as the one here in question. It did so examine this type of cargo and classified it as Grade C flammable liquid, it being placed, as previously mentioned, in the same classification as gasoline, benzine, naphtha and other such substances.[12] It was not classified as a poison either "extremely dangerous" or "less dangerous,"[13] or with having lethal characteristics. It has been said, and rightfully so, that these statutes and the regulations promulgated thereunder amount to much more than a set of prohibitions with punitive sanctions. They establish a standard of care. Marshall v. Isthmian Lines, Inc., 334 F.2d 131 (5th Cir. 1964).

The judge found that the BEREAN was not at fault in carrying acrylonitrile in her forward wing tank. The ship had been engaged in the chemical trade for several months following her construction, and prior to the collision carried various kinds of petroleum products and

7. 35 C.F.R. 4.41.

8. 16 Stat. 440.

9. 46 U.S.C. §§ 170, 170a, 170b.

10. 46 U.S.C. § 170(7) (a).

11. 46 C.F.R. 146.01.

12. 45 C.F.R. 146.21–100.

13. 46 C.F.R. 146.25–5; 146.25–10.

other flammable liquids in her forward wing tanks. The shell, or skin, of the ship constitutes the outer wall of certain of her wing tanks. No protective cofferdams or voids surrounded these tanks. Under pertinent Regulations those tanks may not be used to carry "flammable or combustible liquids having lethal characteristics." [14] Acrylonitrile is similar to gasoline in its burning and explosive characteristics. In addition, it is toxic, and gives off poisonous fumes. These fumes cause illness to persons exposed thereto in relatively weak concentrations over a prolonged period of time and may cause illness or death from a single exposure if in a sufficiently high concentration. Symptoms of this poison are similar to those of cyanide.

Appellants claim that the Coast Guard was in error in not classifying acrylonitrile in the same classification as poisonous gases, or with those having lethal characteristics, as to which different regulations apply. It is said that such a cargo should not be carried in the forward tanks, or that a cofferdam or void space should have been provided between the tank and the skin of the ship. A rule that this type of material should not be carried in the forward tanks of the vessel would probably destroy a substantial segment of the carrying capacity of most tankers. The fact, if it be a fact, that "a large majority of collisions are on the bows of vessels" does not mean that the forward part of a vessel should not be used for the purpose of transporting liquids such as acrylonitrile. No custom or usage is advanced to support this argument. No Regulations were violated by placing the cargo in the forward tanks. For that matter, the regulations of the Coast Guard invited the procedure which was followed by BEREAN in the stowage of this cargo. The charge that the cargo should have been stowed in tanks with a cofferdam, or void, ap-parently was suggested by a Regulation covering the stowage of "flammable or combustible liquids having lethal characteristics." The appellants concede that the Regulations, in effect at the time of the casualty, did not classify the chemical as a flammable or combustible liquid having lethal characteristics.

The Regulations properly distinguish between a chemical which is highly flammable and a chemical which is highly toxic or one having lethal characteristics. Of course, a chemical may be both flammable and toxic and, if sufficiently toxic, should be placed in a different classification than one which is only flammable. To be kept in mind is the fact that the Bill of Lading issued by Andersen to Cyanamid, specifically described the cargo as acrylonitrile, and that the Regulations did not classify the chemical as an explosive, or as a Class A, B or C poison. During the course of the negotiations leading up to the issuance of the Bill of Lading, the export manager of Cyanamid furnished to representatives of Andersen the pamphlet entitled, "Handling-Storage-Analysis of Acrylonitrile." The physical properties of the chemical including its explosive limits, the fact that it was toxic and that it was flammable are set forth in the pamphlet. This is conceded by Andersen. However, it is argued that the ship, and her owner, had a right to rely on the classifications of the Coast Guard made pursuant to the statutes and regulations, and that a stowage of cargo in accordance with such regulations, insulates the vessel and her owner against a charge of unseaworthiness or negligence in connection with such stowage. Although the language used in Marshall v. Isthmian Lines, Inc., supra, 334 F.2d p. 134, 135 [15] speaking of the Regulations, was employed in connection with a factually distinguishable background, we think the rule there stated is sound, and should be applied to

---

14. 46 C.F.R. Part 39.

15. 334 F.2d 134, 135.
"The whole statutory scheme is something much more than a set of prohibi-tions with punitive sanctions. It establishes a standard of care to which all concerned are bound, including those who do, and those who do not, wish to comply."

this charge against BEREAN and Andersen. Another statement of the same legal principle is that official duty has been legally performed. The law so presumes. Board of Public Instr. for Brevard County v. Osburn, 101 F.2d 919 (5th Cir. 1939); Continental Bank & Trust Co. v. Brandon, 297 F.2d 928 (5th Cir. 1962); United States v. Chemical Foundation, Inc., 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926).

We do not believe that BEREAN and Andersen were required to inquire into the validity of the classification of the chemical made by the Coast Guard experts. As applied to the ship and her owner, there was nothing in the Cyanamid pamphlet which would require a different result.

Again, on this point, we are faced with a line of authorities that are distinguishable. Take for instance the Petition of Oskar Tiedemann and Co., 289 F.2d 237 (3d Cir. 1961). The question before the judge was whether the owners of a tanker could claim limitation of liability after they allowed her to sail with tanks that had been emptied of a cargo of petroleum, but contained flammable fumes. The court found that the fumes were more dangerous than liquid cargo and that the vessel did not have proper gas-freeing apparatus and was, therefore, unseaworthy. Again, this is a case where the findings of the judge were upheld. In C. J. Dick Towing Co. v. The Leo, 98 F.Supp. 455 (S.D. Tex. 1951), aff'd 202 F.2d 850 (5th Cir. 1953), gasoline or some other explosive liquid had been allowed to leak into the end section of a barge. This section was not intended for cargo. The judge held that those in charge of the vessel were negligent in not properly inspecting the tow and in allowing the rake tank to be in such a condition that it was a menace and a hazard. Of course, there is no such finding before us. That the existence of gasoline or other explosive fumes, in an area of a ship not designed for that purpose, creates an unseaworthy condition, we have no doubt. No such problem confronts us. The negligent stowage of flammable cargo in a manner which violated approved methods of stowing naphthalene as delineated in the safety regulations of the Coast Guard and of the Dutch Government, was presented by the facts in the Petition of Skibs A/S Jolund, 250 F.2d 777 (2d Cir. 1957), reaffirmed on second appeal 269 F.2d 68, cert. denied 356 U.S. 933, 78 S.Ct. 772, 2 L.Ed.2d 763 (1958). That case offers an interesting dissertation on that type of liability, but is here of no significance. The same can be said of In Re Texas City Disaster Litigation, 197 F.2d 771 (5th Cir. 1952) and Dalehite, et al. v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Such decisions do not remotely support appellants' contention that a tanker may not store flammable cargo in her bow tanks. Again, we have an issue which the judge resolved against appellants. The evidence supports his finding.

## ASSIGNMENT VI

Appellants Mitsubishi and Consul General part company with China Union, on the latter's contention that the judge erred in denying it a limitation of liability under 46 U.S.C. § 183(a).

Our analysis of the record convinces us that the judge was correct in denying China Union limitation and in holding that its own negligence with privity and knowledge contributed to the unseaworthiness of the RELIANCE and the collision as follows:

(a) her steering gear was unseaworthy;

(b) her main engines were unseaworthy;

(c) her captain and chief engineer were not instructed to the effect that all four of her main engines might be coupled astern; and

(d) her telephone communication system between the bridge, engine room and steering engine room was unseaworthy.

We have already dealt, at length, with the judge's findings on the fault of the RELIANCE. Those findings are but-

tressed by an adequate record. To here repeat those findings would be repetitive in the extreme.

 Privity and knowledge are deemed to exist where the owner had the means of knowledge or, as otherwise stated, where knowledge would have been obtained from reasonable inspection. Knowledge or privity of supervisory shore personnel is sufficient to charge a corporation. The judge in holding that there was privity and knowledge on the part of China Union and in denying limitation was well within the standards applied in Avera v. Florida Towing Corp., 322 F.2d 155 (5th Cir. 1963).

 Instead of showing that the unseaworthiness of the steering gear of the RELIANCE was without the privity and knowledge of China Union, its witnesses provided damaging testimony clearly showing the contrary. First of all, the Greek Nationals, by whom the vessel was sold to China Union, would not permit a thorough inspection of the vessel by its representative. On the limited inspection he made, he found many conditions in the engine room which were substandard. On his survey of the RELIANCE, he found the door of the steering engine room locked. On arrival of the vessel in New Orleans, the first chief engineer recommended to the company that all auxiliary engineering equipment be opened, inspected and overhauled. Nothing was done on this recommendation. China Union, evidently in an effort to save expenses, did not make such inspections, breakdown or overhaul. The testimony is quite clear that China Union would not permit a thorough inspection of the steering gear while the ship was in Taiwan. Many spare parts, which would be normally carried on a vessel of this type, were missing and, in particular, essential parts in connection with the steering apparatus were missing. This, and other evidence, fully supports the judge's finding [16] of privity and knowledge of a defective steering gear on the part of the owner. Likewise, the judge's findings that the vessel was unseaworthy in the other respects with the privity and knowledge of China Union are as fully supported by the evidence. The City of Camden, 292 F. 93 (3d Cir. 1923), cited by China Union, lends neither substance nor support to its contention. On the other hand, the principles stated in that case are in full accord with the findings here under attack. The burden of proof as to the absence of privity or knowledge was on China Union. Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363, States S. S. Co. v. United States, 259 F.2d 458 (9th Cir. 1958), cert. denied 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305 (1959), rehearing denied 359 U.S. 921, 79 S.Ct. 579, 3 L.Ed.2d 583 (1959); The Law of Admiralty, Gilmore & Black, 705.[17]

We do not question the soundness of the authorities cited by China Union on this assignment. Yet, the attempt by it to apply the doctrines stated in those cases to our factual background is entirely unsuccessful. Her claim that the RELIANCE'S sheer across the channel was caused by her navigating too close to her starboard bank is foreclosed by

16. "The owners of UNION RELIANCE were at fault and negligent in failing to have had a careful and complete inspection of her steering system prior to the collision. Such an inspection no doubt would have disclosed the use of the wooden blocks, excessive leakage and loss of large quantities of telemotor oil (another possible cause of the casualty), and perhaps other difficulties. In view of the knowledge which the owners had even before accepting delivery of UNION RELIANCE that her main engine room was in a deplorable state from age, excessive wear, and inadequate maintenance; and of the almost constant difficulties encountered with the main engine, a prudent owner would have anticipated difficulties in the steering system, and would have taken steps to protect against their malfunction." (F. 31, R. 5133–5134.)

17. "It seems reasonable that the shipowner, who invokes the Limitation Act, should bear the burden of proving the absence of privity or knowledge: as to that branch of the case he is the moving party and the facts are peculiarly within his knowledge."

the judge's finding that the sheer was caused by unseaworthy steering gear. The district court's findings that the RELIANCE'S main engines were unseaworthy and that her captain and chief engineer were not properly instructed prevent a successful assault along those lines. China Union states that there is no evidence whatsoever to support the judge's finding that the RELIANCE'S telephone communication system between the bridge, the engine room and the steering room was unseaworthy. This statement is clearly wrong. The record contains uncontradicted evidence that when the emergency arose on the RELIANCE, and communications had to be made between the bridge and the engine room, and between the bridge and the steering engine room, this was accomplished by sending messengers running about the ship, rather than by attempting to use the sound powered phones. Certainly, this creates a strong presumption that the phones were out of order. This evidence and the inferences to be drawn therefrom, clearly support the judge's finding that this condition contributed to the collision and that there was no direct means of phone communication between these important stations on the vessel. Obviously, a prompt telephone call to the steering engine room for full speed astern, might well have averted the collision.

There is no substance to this assignment.

## ASSIGNMENT VII

On this assignment, appellant China Union disclaims liability on the theory that the fire originated from the other vessel and that it, as a carrier, was protected under its Bill of Lading and the Fire Statute.

The provisions of CGSA [18] required China Union to exercise diligence: (a) to make the ship seaworthy; (b) to properly man, equip and supply the ship. Subsection (8) of the Act nullifies any clause, covenant or agreement in a contract of carriage which would relieve the carrier or the ship from liability for loss or damage, to or in connection with the goods, arising from fault or failure in duty in the obligations imposed by the Act. 46 U.S.C. § 1303 (8). Section 1304(1) places on the carrier the burden of proving due diligence when the loss or damage results from unseaworthiness. These provisions and the finding by the judge of unseaworthiness on the part of the RELIANCE, places the petitioner beyond the protective provisions of the Act. The particular fire was "caused by the actual fault with privity of the carrier." CGSA offers no escape to China Union. Even if the issues were doubtful they should be resolved in favor of the cargo. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903); Artemus Maritime Co., Inc. v. Southwestern Sugar & Molasses Co., Inc., 189 F.2d 488 (4th Cir. 1951).

## CLAIM AGAINST CYANAMID

China Union and the Consul General complain of the action of the judge in dismissing the libel against Cyanamid. Aside from the subject discussed under Assignment V, the appellants pose two additional assignments against Cyanamid: (1) the procedure on the dismissal, and (2) that Cyanamid had actual knowledge, or by the exercise of reasonable diligence should have known, of the dangerous, poisonous and lethal characteristics of acrylonitrile, of which the Coast Guard and BEREAN had no knowledge.

At the outset, we must stress the grave doubts we entertain on whether China Union has standing to press these assignments. The damage to RELIANCE and its cargo was caused by fire, not by the poisonous or toxic qualities of the chemical. Since gasoline and other such products are as flammable and explosive as acrylonitrile and since such other products may be legally carried in forward tanks, next to the skin of the ship, it would seem that no causal relationship exists between the toxicity of that chem-

18. 46 U.S.C. § 1300 et seq.

ical and the fire damage to China Union's property, or its cargo.

▮ (1) The first point is one of procedure, rather than substance. The record shows that during the course of the trial, the judge asked all parties if all evidence, except as to damages, had been presented against Cyanamid. After counsel for the respective parties indicated that they had no additional evidence to offer against that company, its proctor moved for a dismissal.[19] Forty pages of the record are devoted to a transcription of the arguments of the proctors on this motion. No claim was made that there was additional evidence to offer on the subject. For that matter, the precise issues raised on this appeal were fully argued to the judge. At the conclusion of the arguments, the motion was taken under advisement and was not decided until the following morning, at which time the judge found in favor of Cyanamid.[20] Obviously, the judge made findings on the issues then before him. In the formal findings, the judge made it clear that he was passing on the issue of the liability.[21] We must view this record as the findings of the judge on the issues then presented. Those findings, unless clearly erroneous, even though informal, are binding on us. Myles v. Quinn Menhaden Fisheries, 302 F.2d 146 (5th Cir. 1962). The fact that the findings were made on a motion for dismissal, or for a *directed verdict*, as argued by one of appellants, is of no significance.

(2) On the motion for dismissal, the proctor for Cyanamid argued that the evidence almost conclusively demonstrated that the Chinese crew men died or were injured as a result of the raging fire, on the water and on the RELIANCE. Proctor for the dead and injured seamen, on the other hand, argued that the men died from, or were injured by, the toxic and poisonous effects of the chemical. Cyanamid pointed to the evidence of a young lieutenant of the Coast Guard who testified that he and his men worked right at the hatch where the particular cargo was loaded, and from there fought the fire with no ill effects. A number of the members of the crew of the BEREAN testified that they went forward and fought the fire with no ill effects. The master of the tug boat said that he was in there fighting the fire. Members of the crew of RELIANCE were on the foredeck fighting the fire. Most of the photographs of decedents, with one exception, disclose faces and bodies that were "badly charred." The one major exception was the picture of a Chinese second mate, who evidently died in the cabin deck washroom. He was not burned, nor was there anything else observed which pointed to the cause of his death. The

19. "Mr. Waesche: If Your Honor please, in that event we would like to move to dismiss the action against American Cyanamid, on the grounds that the libelants have failed to establish a cause of action against them." (R. 3413.)

20. "As to the motion of American Cyanamid Company for judgment at the conclusion of the petitioner's case, I think the motion is well taken and will be granted. As the manufacturer and shipper of an inherently dangerous commodity, I understand the law to impose on them the duty to warn and advise others who may come in contact with it of its dangerous propensities. I think the evidence shows clearly here that that was done, that the carrier was fully advised of the dangerous characteristics of the cargo, and without deciding the question, but if there be any fault in the way the BER-

EAN was loaded, as to which tanks the cargo was carried, and so forth, I consider that to be a fault of the vessel and of Andersen, and not of the shipper." (R. 3454.)

21. " * * * At the close of petitioner's case, the Court afforded all parties an opportunity to introduce evidence bearing on the issue of the liability of American Cyanamid Company; and was advised by all counsel that the claim against American Cyanamid rested solely on the evidence produced by petitioner. The Court was of the view that petitioner had failed to show a cause of action against American Cyanamid on behalf of UNION RELIANCE, her cargo interests, or others, and dismissed the libels against that respondent." (Emphasis supplied.) (R. 5118.)

photograph in evidence, and the testimony shows, that the pilot Duncan was burned beyond recognition.

In support of his position, proctor for the injured and decedents, called attention to the unburned body of the second mate that was found in the washroom, the body of the oiler-wiper who was found above the main deck and who was not "burned too seriously," and to the testimony of the funeral director that he examined five bodies which were recovered in Galveston Bay, over one week after the casualty. He testified that he did not find burns "to any noticeable degree." These bodies were puffed and swollen to such an extent that examination was difficult. The undertaker thought that the death of each of these men was caused by drowning.

Even the death certificates do not support the theory that death could have been caused by the toxic or poisonous effects of the chemical under observation. Five of the certificates gave the cause of death as "drowning, due to jumping overboard"; five of the certificates gave the cause of death as "suffocation, 2nd & 3rd degree burns," and one certificate gave the cause of death as "septisemia, due to major thermal body burns." Even as to the decedents whose deaths were attributed to drowning, the funeral director conceded that there were burns on the bodies.

In any event, both in the testimony and on the argument, the theory of the Consul General was fully presented to, and explored by, the able trial judge. After analyzing all of the evidence, he found that the deaths and personal injuries were caused by fire.[22] While this specific finding was not made at the time of ruling on Cyanamid's motion for dismissal, no additional evidence was produced on the subject. For that matter, the final dismissal as to Cyanamid is a part of the main interlocutory decree, from which this appeal is prosecuted. This dismissal, of course, was entered after the entry of the findings and conclusions. Therefore, Cyanamid is entitled to the benefit of each finding on which the decree is based.

If, in fact, it could be said that the judge failed to make a finding on the issue of the cause of death or injuries, nevertheless, the burden of proof on that issue was on the Consul General. Consequently, all facts not embraced in the specific findings should be regarded as not proved by the party having the burden of proof. Shapiro v. Rubens, 166 F.2d 659 (7th Cir. 1948); Container Patents Corp. v. Stant, 143 F.2d 170 (7th Cir. 1944), cert. denied 323 U.S. 734, 65 S.Ct. 71, 89 L.Ed. 588. Appellant had a right to seek a specific finding if he so desired.

Any other finding by the judge, on the record before him, would be based on pure speculation and guess work. This is conceded by Dr. Brieger, the principal witness for China Union and its dead and injured crew members, who testified that an autopsy would be required before even an expert could express an opinion on whether any one of these men died from exposure to acrylonitrile.[23] With

<hr>

22. "As a result of the fire caused by the collision, Houston Ship Channel Pilot Duncan and the following crew members of UNION RELIANCE were killed: Lan Jing-Chau, Chen Teh-Yao, Wu Hsing-Rei, Wu Shih-Ming, Pao Fuh-Gen, Huang Ah-Tong, Hu Ah-Wang, Ting Chea-Fah, Yuan Sing-Wang, Hsia Lian-Ken, and Koo Kuang-Yan; and the following were injured: Hau Wen-Tsai and Mang Han-Ying. In addition, much of the cargo of the UNION RELIANCE (principally that in the forward holds of the vessel) was lost, as well as the personal effects of the crew." (R. 5130.)

23. "An autopsy would show whether the man, in addition to the effect of the fire, has absorbed large quantities of acrylonitrile, which, as I have told, will be converted into cyanide, a very easy affair; it can be shown with a spectrophotometer and otherwise; and if such an autopsy is made, one can state whether this individual had absorbed such quantities of acrylonitrile that they in themselves would have killed this man. *But this can only be done—such a statement can only be made if a proper autopsy has been made, or if the blood*

this opinion in the record, a trial judge could arrive at no conclusion other than that the Consul General had failed in his burden of showing that death or injury was caused from the toxic effects of the acrylonitrile.

 Completely disregarding the effect of the controlling finding that fire was the cause of the deaths and personal injuries, both China Union and the Consul General again point to testimony indicating a practice in the chemical industry to construct cofferdam space around tanks in which dangerous chemicals are to be transported and that one of the purposes of such construction was to prevent the escape of such chemicals in the event of a collision. Other testimony indicates that it was a common practice in the industry to carry dangerous chemicals away from the skin of the ship. Doctor Brieger testified that sufficient bodily contact with acrylonitrile would, in his opinion, cause death by ingestion or by inhalation of its fumes. He, likewise, opined that acrylonitrile was much more poisonous than a five percent dilution of hydrocyanic acid which, by Coast Guard Regulations, was classified, for transportation purposes, as a Class B poison. He thought that the statement in Cyanamid's literature that acrylonitrile produces symptoms "similar to those produced by hydrogen cyanide" was incorrect. His thought was that the symptoms were precisely the same, but this is a mere play in words, and not of substance. He also believed that if rat tests had been made by the Coast Guard with the chemical, it probably would have been classified in a Class B category as toxic or poisonous in nature. The judge was not bound to accept and apply these opinions. He was only bound to give to them such weight as he thought they deserved and he was at liberty to entirely

reject them if he felt that the reasons given in support thereof were unsound. This rule is applicable to a trial judge, as well as a trial jury. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627–628, 64 S.Ct. 724, 88 L.Ed. 967 (1944). Also, the judge had the opportunity to see and hear the witness and pass on his credibility.

Beyond that, the printed record of this witness' testimony presents a portrait of considerable doubt on his part as to whether the Coast Guard, in fact, wrongfully classified the chemical. In its final analysis, this witness' testimony does not require a finding that Cyanamid knew, or by the exercise of reasonable diligence should have known, that the Coast Guard classification of the chemical was in error. Of significance, though not controlling, is the fact that the casualty occurred in November, 1961. There was an immediate Coast Guard investigation. The classification of acrylonitrile has been reviewed by the Coast Guard on at least three occasions [24] since the casualty and remains in the same classification. The legal principles applied in Whorton v. T. A. Loving & Co., 344 F.2d 739 (4th Cir.1965), are sound, but the factual background there discussed is so far removed from ours that such principles cannot be here applied. For the purpose of this opinion, we have assumed that liability would attach to Cyanamid if the evidence disclosed a breach of duty, tortious or contractual.

 Aside from everything else, it would appear that the proximate cause of death of and injuries to the seamen, and for that matter all other damages, was not the inherent nature of acrylonitrile, nor any lack of care in its manufacture, nor in giving notice of its toxic or poisonous qualities, nor its stowage location on the ship, but was the unanticipated

---

*is bright red; that's a much simpler method. It would indicate that the man has indeed absorbed very large quantities or large quantities of acrylonitrile, with the consecutive development of cyanide."* (Emphasis supplied.) (R. 2129.)

24. (1) 46 C.F.R. § 146.21–100, p. 172, § 146.25–200, p. 495–694; (2) 46 C.F.R. § 146.10–100, p. 20, § 146.25–200, p. 220–256; (3) Federal Register, December 24, 1964, Vol. 29, No. 248, pp. 18163–18168.

wrongful action of the RELIANCE in crossing to the wrong side of the channel and propelling its ax like bow against, and substantially through the tank in which the chemical was stowed. The remarkably clear pictures in evidence demonstrate that the RELIANCE ruptured the skin of the BEREAN and advanced into the hull to a depth of approximately 14 feet. Obviously, the inside skin of a cofferdam would have been ruptured and such a dam would not have prevented the escape of the chemical. Under the weight of this assault, a cofferdam would have provided no more protection than would a sheet of tissue paper.

### CLAIM OF UNITED STATES

China Union alone challenges the claim of the United States. The claim consists of three separate items:

(1) expense of removing and re-anchoring the RELIANCE, $8,582.00, and

(2) expense of shipkeepers and similar expenses to preserve the property, $6,031.38, and

(3) expense of stand-by tug to prevent the vessel from moving and re-blocking the channel, $21,188.00.

 That the RELIANCE, as a result of the casualty, became a flaming derelict which imperiled the very existence of other watercraft and obstructed and prevented the navigation of the channel, is beyond argument. The owner and underwriters were unable to control the fire. Acting under the emergency provisions of 33 U.S.C. § 415, the United States District Engineer, after a special investigation, made a determination that the RELIANCE was a special danger to navigation and, after notice to owner,

directed that the vessel be towed from the channel and anchored in Bolivar Roads, adjacent to the channel.

After removal of the vessel, the United States filed a libel, asking for the sale of the vessel,[25] to pay the cost of removal and incidental expenses. This proceeding was enjoined, on November 29, 1961, on China Union's petition for a limitation of liability. After granting the injunction, the judge required China Union to pay into court the cost of removal of the vessel in the sum of $8,582.00. Other proceedings, and allowances, are outlined in detail in American Cyanamid Co. v. China Union Lines, 306 F.2d 135 (5th Cir.1962), in which proceeding the circuit court refused jurisdiction, but suggested that the district judge might make findings on the issues presented.

 On the first issue, the Government must prevail. It had a statutory right to hold the vessel and cargo, dispose thereof at public sale and deduct from the proceeds $8,582.00, the expenses of removal. While the Government could not proceed in personam, against China Union, United States v. Bethlehem Steel Corp., 319 F.2d 512 (9th Cir.1963), cert denied 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1964) and United States v. Zubik, 295 F.2d 53 (3d Cir.1961), we must remember that it was China Union which was seeking the injunction and a limitation of its liability. It was to its advantage, and the advantage of its underwriters, to free the RELIANCE of the Government's statutory lien, and secure the decree of injunction. The judge, in requiring China Union to make this payment, recognized that the equities were with the Government and that the Government's lien was first in time and prior in right.[26] The order of the court

25. Sold as scrap for $109,100.00.

26. "Had this Court not intervened * * * the Government might have sold the vessel and her cargo. The statute does not make this right conditional. It exists irrespective of the Petitioner's right to limit. Petitioner may not deprive the United States of its right of sale by undertaking to surrender the vessel. The payment of this sum—and release of

this charge against the vessel—was necessary before she could be surrendered in a limitation proceeding. Hence, under § 185 of Title 46, U.S.C.A., I fix this sum of $8,582.00 as an additional amount to be deposited with this Court by Petitioner, for the use and benefit of the United States, as necessary to carry out the provisions of § 183 of Title 46, U.S.C.A." (Order, January 28, 1963.)

did not amount to a judgment *in personam* against the petitioner, but merely required China Union to do what it should have done in the first instance.

On December 3, 1962, after receipt of the mandate of the Court of Appeals, the judge held a supplemental hearing, at which time testimony was taken and exhibits introduced in connection with the nature and reasonableness of the Government's and other claims. Eighteen witnesses testified at this hearing and there is solid evidence to support the finding in favor of the Government. The fact that the judge's finding on the subject, is included under his conclusions of law,[27] is of no significance. Compania Transcontinental de Petroleo, S.A. v. Mexican Gulf Oil Co., et al, 292 F. 846 (2d Cir.1923); Arkansas Amusement Corp. v. Kempner, 57 F.2d 466 (8th Cir. 1932). Even in the absence of a finding of fact, this being a trial *de novo*, we would be compelled to say that the record fully supports the pertinent provisions of the interlocutory decree. True enough, specific amounts are not mentioned in this finding. However, there can be no misunderstanding as to the amounts, in that the division of the Government's claim, both in the exhibits and the testimony, was uniform and precise. They are the figures which are set forth, with exactness, in the interlocutory decree.

It is our view that item (3) of the Government's claim is also covered by the provisions of 33 U.S.C. § 415, and that the lien against the RELIANCE for such item was also first in time and prior in right. The statute contemplates that the Government hold said vessel for a period of thirty days, after notice to the owner, and thereafter until sale. It is logical to assume that the Congress intended the Government to take proper care of the vessel during possession. The "expense of removing," in our opinion, should not be limited to the precise cost of removing the vessel from the place of

the casualty to a place of safety, but should also cover any and all reasonable expense incidental to the removal and enforcement process, such as the expense of safeguarding. This expense is contemplated by the statute. Petitioner's arguments that the tug hire of $21,188.00 was not a legitimate expense, is illusory in the extreme. The record discloses many considerations which weighed in favor of having the tug stand by, rather than using two anchors. The District Engineer, after consultation with Coast Guard officers, decided to use only one anchor and have the tug stand by, so as to be assured of its immediate availability in case the anchor did not hold. Those making the decision were of the opinion that (1) two anchors might foul the vessel, (2) the anchor windlass and the deck supporting it had been subjected to severe fire, (3) the "upper shots" of the anchor chain had been subjected to severe heat, (4) the Galveston area was subject to severe changes in weather conditions, (5) the tide was exceptionally swift where the vessel was anchored, and (6) the vessel, even with dual anchors, might well slip back into the channel. True enough, the court eventually found that the tug was not necessary to keep the RELIANCE at its anchorage, and this is the point on which China Union principally relies. Here, the mischievous aura of validity which lurks behind the veil of hindsight is again presented. The original action of the District Engineer in ordering the tug to stand by, when viewed in light of his obligation to protect the traffic in the channel without unduly jeopardizing the vessel and its cargo, is quite understandable. The judge's action, in subsequently ordering the tug dismissed, was taken after more than two weeks of actual experience in holding the vessel at anchor. It does not imply disapproval of its previous use; indeed, doubtless because of his own wise reluctance to be governed by hindsight, the judge expressly refused to pass on

27. "9. China Union Lines, Ltd. is liable to the United States of America for the expenses incurred in connection with this

incident and made the subject matter of the claim of the United States."

that question at that time. The record reveals no subsequent developments weighing against his ultimate approval of the charge.

■ On November 27, 1961, the judge dismissed the tug from standing by the RELIANCE and, on that day, placed shipkeepers aboard pending the further order of the court. At the same time, custody of the vessel was taken by the United States Marshal and the court was thereafter in possession. Earlier, on November 24th, the District Engineer, acting on order from the United States Attorney's office, caused shipkeepers to be placed aboard and the cost of employing those shipkeepers, round the clock, both before and after the court order is, in major part, the basis for the Government's claim of $6,031.38. China Union charges that the Government was no longer in possession of the vessel and is not entitled to this allowance. This claim is without validity, whether we view the service performed as under the statute, or as an allowance by the court to the Government for expense incurred in connection with protecting the vessel, after the seizure by the Marshal. Our only area of doubt is whether any allowance should be made for the three day period November 24–27, when the tug was also standing by. It does not appear that this "over-lapping" was called to the attention of the judge and he may want to take another look at this feature in the other proceedings which must be hereafter conducted by him. We believe that the employment of the shipkeepers on and after November 27th, should be treated as an "expense of justice" and entitled to preferential treatment. New York Dock Co. v. S.S. Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); The St. Paul, 271 F. 265 (2d Cir.1921). Since these expenses were necessary they should be allowed. Yokahama Specie Bank v. Wang, 113 F.2d 329 (9th Cir.1940); Palmer v. Burns Bros. No. 77 The Transfer No. 7, 176 F.2d 950 (2d Cir.1949).

## OTHER CLAIMS

China Union claims a right to payment of its own salvage expenses out of the limitation fund, on the theory that the value to be surrendered in a limitation proceeding is the value of the owner's interest in the vessel immediately after the casualty. Here, we call attention to the fact that the judge reserved ruling on this particular issue and at one time indicated that he favored the position of China Union.[28] One of the provisions of the interlocutory decree makes it crystal clear that the judge was not passing on the issues between claimants to the limitation fund.[29] The validity of petitioner's salvage claims, including its claim for the refund of said $8,582.00, and other sums previously paid into the registry, are subject to the "further orders" of the District Court.[30]

[27] The assessment of interest against China Union on the originally unlisted prepaid freights, was a matter within the sound discretion of the judge. Petitioner's claim that it proceeded in the utmost good faith, in withholding such freights, was a subject to be weighed and considered by the judge in charge of the proceeding. Obviously, he felt that the petitioner's action, in consistently attempting to set off its claimed salvage charges against the amount of the prepaid freight and interest, was arbitrary and unnecessary. The record supports this assessment of interest. An allowance of interest is recognized in La Bourgogne, 139 F. 433 (2d Cir.1905); La Bourgogne (Deslions v. La Com-

---

28. Order, January 28, 1963.

29. "(3) That after payment of the Trustee's expenses, as hereinabove provided, the claim of the United States of America shall be paid as hereinafter provided *following which any funds remaining in the registry of the Court shall remain pending further orders of this Court.*" (R. 5148.) (Emphasis supplied.)

30. China Union, whose fault was the sole cause of the casualty, may not be entitled to make a claim for salvage, The Clarita and The Clara, 90 U.S. 1, 18, 23 L.Ed. 146, 150 (1874).

pagnie Generale Transatlantique), 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973 (1908). Even if viewed as a penalty, the exaction of the interest under the facts in this case would be justified.

## CONCLUSION

On appeal in an admiralty case, the appellate court is bound by the findings of the trial court and they will not be set aside unless the party seeking to have them overturned demonstrates that they are not supported by credible evidence, or were induced by an erroneous view of the law. Trinidad Corp. v. Indian Towing Co., 293 F.2d 107 (5th Cir. 1961), cert. denied 369 U.S. 861, 82 S.Ct. 951, 8 L.Ed.2d 19; Ohio Barge Line, Inc. v. Oil Transport Co., 280 F.2d 448 (5th Cir.1960).

On the entire record, to considerable of which we have made specific reference, we hold that the trial judge's findings were amply supported by substantial evidence, and not clearly erroneous. We have a firm conviction that each of the parties received a fair and an impartial trial. We find nothing in the brief of Lucy Duncan to justify striking the same from the file. The motion is denied. The interlocutory decree is affirmed.

JOHN R. BROWN, Circuit Judge (concurring in part and dissenting in part):

I concur fully in all of the very excellent opinion prepared for the Court by Judge Kilkenny except as to some portions in the section entitled "Assignment V" as to which I have some reservations and that part entitled "Claim Against Cyanamid" which I believe to be erroneous. As to the latter I dissent. My difference would not change the result as between BEREAN and RELIANCE, between RELIANCE'S Cargo and RELIANCE, between the injured/decedents and RELIANCE and her owners, or the denial of relief as to injured/decedents against BEREAN. It would afford RELIANCE and the injured/deceased victims the right to show that damages and injuries were caused or aggravated by Cyanamid's neglect of its duties. To this extent and for this purpose, I believe the case should be reversed and remanded.

As to "Assignment V," I accept the proposition that a shipowner is entitled to rely on the classification of the material and the stowage requirements prescribed by the regulatory agency, here the Coast Guard. There may, however, come a time when a carrier acquires so much knowledge about the peculiar characteristics of a particular cargo, which are not generally known, that it can no longer rely solely on the insulation afforded by reading and applying Coast Guard regulations which it knows in fact are either wrong or incomplete. The aim of the regulations, the aim of the law, is to promote safety, especially to the innocent third parties—crew members, longshoremen, persons on other vessels, members of the public, and others—who are likely to be exposed to the hazards of the product in its normal course of distribution, transportation, and handling. That aim is hardly achieved by an absolute which declares that a shipowner may ignore hazards not disclosed by the Regulations, but of which it knows and knows how to minimize by prudence. This is a long way from making every shipowner his own chemist, physicist, physical chemist, or the like in this day of scientific marvels and new esoteric products.

But Cyanamid is in no such favored position. It is the manufacturer and supplier of a chemical that it knows can and does kill. Cyanamid's awesome obligations in this day of products liability when Acrylonitrile goes to sea is no less than on land. It cannot rely on—and the proof does not even begin remotely to suggest that it ever did, or would, rely on—the Coast Guard. Cyanamid knows that if it—a huge industrial enterprise which proudly claims a pre-eminence in this chemical field—relied on the Coast Guard with its limited laboratory facilities for its research and development, it would go bankrupt. The Coast Guard might come to it, but it would never, simply never, go to the Coast Guard to

ascertain what the characteristics and hazards of its own product are.

So while the law affords to BEREAN the right to accept a faulty Coast Guard classification, Cyanamid can claim no such privilege. Its own published pamphlet entitled "Handling-Storage-Analysis of Acrylonitrile," introduced as an exhibit and to which the Court's opinion refers, makes it clear that it was, as Dr. Brieger testified, no less toxic than a Class B poison since it was more toxic than the test standard 5% dilution of hydrocyanic acid. Dr. Brieger had pre-

eminent qualifications which Cyanamid never challenged—indeed could not challenge.[31] If, as the Court suggests, his testimony was guarded, occasionally hesitant, it was, as the quoted reference to autopsies (see note 23) reveals, just another clear proof of his scientific competence. Time and time again, he made plain, based upon a lifetime study and industrial experience with this very compound, that for seamen to be afloat in water having a film of Acrylonitrile on the surface [32] would mean almost certain death.[33] And that is what Cyanamid's own pamphlet reflected in vivid terms.[34]

31. Dr. Brieger had made tests and reports on Acrylonitrile which were submitted to Cyanamid.

32. In the collision, No. 1 port wing tank was ruptured. All of the 226 tons of Acrylonitrile spilled out into the channel.

33. Ironically the record reveals that about a year after this collision, the Master of BEREAN was killed by Acrylonitrile fumes resulting from a very small leak in the pump room. No one, certainly not Cyanamid, suggests that this post-collision event was an untoward surprise to those knowledgeable about Acrylonitrile.

34. As to handling the chemical, Cyanamid explains:
"The precautions set forth in this bulletin are the results of the experience gained in handling and storing Acrylonitrile during this period. It should be emphasized at the outset, that because of the toxic and flammable nature of Acrylonitrile, handling operations should be performed in areas which are properly ventilated and free from sources of ignition."
As to cleaning tanks in which Acrylonitrile has been stored, Cyanamid warns:
"Protective equipment should be made available to those entering [storage] tanks. This equipment should include cover-alls, eye goggles, and gas masks. * * * The person working in the tank should be provided with a body harness with life line attached. Station a man on the outside end of the life line to do nothing but watch the worker within."
And the type of gas mask required differs with the concentration of the chemical's vapors:

"Use this type of canister (organic vapor) *only* in locations where the Acrylonitrile vapor content is less than 2% and the oxygen concentration is above 16%. Otherwise a mask with self contained oxygen or air supply *must* be employed." [Emphasis in original]
Cyanamid is the last to minimize the effects of the chemical on the human body:
"Acrylonitrile is toxic by inhalation, by absorption through the skin, and by oral ingestion.
" * * *
"Poisoning by Acrylonitrile produces symptoms which are similar to those produced by hydrogen cyanide. Excessive vapor inhalation causes weakness, headache, sneezing, abdominal pain, and vomiting. Absorption of large amounts of the liquid through the skin produces similar symptoms. * * *."
And in describing the proper methods of waste disposal, the manufacturer warns of the danger to fish:
"Acrylonitrile stream effluents should be treated to such an extent that they pose no danger to downstream public water supplies or to aquatic life. * * Although it has been demonstrated that fresh-water fish can tolerate an Acrylonitrile level of 10 p.p.m., the actual tolerable limit will depend on local conditions and use of streams."
And if that "aquatic life" happens to be seamen afloat, who will both absorb and breathe vapors, "the currently accepted threshold limit for * * * an eight-hour exposure is 20 parts of vapor per million parts of air," which makes it more toxic than carbon tetra chloride (25 p.p.m.) *but only slightly less toxic than* hydrogen cyanide (10 p.p.m.) Nevertheless, the chemical is toxic enough so that "the regimen of treatment [by a physi-

The question is not whether BEREAN was at fault in loading Acrylonitrile in skin tanks unprotected by cofferdams. The question is whether Cyanamid knowing what it does, could knowingly load BEREAN at Cyanamid's terminal knowing also that the cargo was going into skin tanks. In this respect Cyanamid had duties that transcended those it owed to Andersen or BEREAN and which, the Court supposes, it perhaps satisfied by showing the Master the blue pamphlet. It owed a duty literally to the world—at least that world within the reach and protection of American jurisprudence, land-based, salt water and amphibious. It had to have in mind port workers at the place of loading, crew members on the carrying vessel, crew members on accessorial tugs, owners and crew members of vessels with which the carrying vessel might come in contact by collision or otherwise, port officials, customs inspectors, immigration officers, maritime service personnel, and members of the public. The duties owed to this limitless group of protectees require as a minimum that it not knowingly participate in a method of handling or transport which would imprudently imperil the lives of these people. I do not suggest here that Cyanamid, the manufacturer-supplier-shipper, has the liability of an insurer, but it certainly has the far-reaching awesome liabilities now associated with products liability. Putman v. Erie City Mfg. Co., 5 Cir., 1964, 338 F.2d 911, Restatement, Torts § 388. When the material is fraught with so much danger, the liabilities may be almost absolute either because the so-called ordinary care of the prudent person itself calls for care which is extraordinary or because of principles of strict liability. Indeed, this teaching of Texas City was not lost to the industrial or judicial world because the Government as the manufacturer of FG AN escaped liability from the peculiar governmental "discretionary function" exemption, Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, or the stringent limitation of the scope of the FTCA to exclude "novel and unprecedented" cases, a reading which was shortly to be repudiated. Rayonier v. United States, 1957, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354.

But the trial Judge never really faced up to this issue. Nor does this Court. Rather, each equates Cyanamid's obligations with those the carrying vessel BEREAN owed to others. As to the BEREAN, the Coast Guard regulations so long as BEREAN did not know they were faulty, were an adequate insulation. But in relation to members of the public and others, Cyanamid could not fall back on the Coast Guard. The problem was really not whether the Coast Guard classification was in error, as Dr. Brieger tried to demonstrate. Rather, it was what Cyanamid actually knew and ought to have known about its own product and knowing that, what in prudence considering these extremely high hazards could and ought to be done to minimize,[35] if not eliminate, the devastating consequences of a foreseeable casualty.

This was a basic error in approach by the District Judge. And our efforts to

cian] recommended for Acrylonitrile poisoning is that for cyanide poisoning."

In several places and ways the pamphlet equates Acrylonitrile with Hydrogen Cyanide (Hydrocyanic Acid). This is a Class A poison, § 146.25–5, defined as "poisonous gases or liquids of such nature that a very small amount of gas, or liquid, mixed with air is dangerous to life." As such it is listed with only 13 other poisons, three of which are military poisonous gases. And footnote 1 to Hydrocyanic Acid permits dilute solutions not exceeding 5% strength to be classed as Class B poisons. Class B covers "Poisonous liquids or solids * * other than Class A, C or D poisons, which are known to be so toxic to man as to afford a hazard to health during transportation." § 146.25–10. Rat and rabbit ingestion, absorption and inhalation test standards are thereafter prescribed. There is no evidence to refute Dr. Brieger's testimony that Acrylonitrile would fail these tests.

35. BEREAN had main tanks 1 through 8 divided by longitudinal bulkheads affording a series of 16 inboard tanks fully separated from the ship's hull by wing tanks on each, port and starboard, side.

overcome the deficiency by questioning the standing of China Union to assert the claim and to hold as a matter of law that there could be no proof of *causation* as to the claims of the injured/deceased will not suffice. We must recall that this case, as are all extensive maritime catastrophies, was being tried in two stages —liability and damages. This is the first time, to my knowledge, for example, in which death certificates, issued generally in Texas by people whose only competence is the lowest office in the judicial hierarchy—prove the cause of death. I agree the issue has not been proved. No more so was the damages sustained by BEREAN or its cargo. That is to come later. As to China Union's standing, at the liability phase only, who is to say that had the fumes from this lethal cargo not have been freed by rupture of the hull forming the tank sides, the action on RELIANCE might not have been different?

On this record, the Judge should have held that as against Cyanamid a prima facie case had been made out. Cyanamid should have been put to its proof to refute, if it could, the hazardous characteristics, and on what prudence would require of the manufacturer-supplier-shipper of a product of such deadly potential.[36] The Judge would then have decided whether Cyanamid had the usual land-based products liability of a chemical manufacturer. If he declared in the affirmative, proof of damages, if any— and I do not minimize the if any—would be opened for a second stage on damages.

The admiralty has led, not followed. But here salt water dilutes the responsibility now so plainly resting on the manufacturer-supplier-shipper of a commercially useful, indeed valuable, chemical compound which carries death with its utility.

I would therefore reverse for further hearing as appropriate on the claims of RELIANCE and her owners, and the injured/decedents against Cyanamid.

---

36. Indeed at this point the Coast Guard regulations might turn on Cyanamid to prescribe an absolute standard. Cf. Marshall v. Isthmian Lines, Inc., 5 Cir., 1964, 344 F.2d 131. If, as Dr. Brieger so stoutly maintained, the rat tests prescribed by § 146.25–10(1) (2) (see note 34, supra) would bring Acrylonitrile within Class B poisons, then it is undisputed that for a combustible liquid having lethal characteristics and defined as a Class B or Class C poison, such cargo must be carried in tanks which are independent of the ship's hull, separated by cofferdams, etc. 46 C.F.R. § 39.01–1, .05–1. The significance of such tests would not be to establish that classifying Acrylonitrile as inflammable by the Coast Guard was erroneous as such. Rather, since a manufacturer knows what accepted tests would reveal, the significance would be to forbid the manufacturer as shipper to tender it for shipment without disclosing all these characteristics and to knowingly participate in a loading or shipment which, with such knowledge, it knows to be dangerous. Cf. 46 U.S.C.A. § 170(10).